NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
Nos. 2013-0591
      2013-0668


THE STATE OF NEW HAMPSHIRE

v.

EXXON MOBIL CORPORATION & a.

Argued: May 21, 2015
Opinion Issued: October 2, 2015


Joseph A. Foster, attorney general (K. Allen Brooks, senior assistant attorney general, on the brief and orally), Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., of Washington, D.C. (David C. Frederick and Brendan J. Crimmins on the brief, and Mr. Frederick orally), and Pawa Law Group, P.C., of Newton Centre, Massachusetts (Matthew F. Pawa and Benjamin A. Krass on the brief).


McLane, Graf, Raulerson & Middleton, Professional Association, of Manchester (Bruce W. Felmly and Patrick H. Taylor on the brief), Bancroft PLLC, of Washington, D.C. (Paul D. Clement on the brief and orally), and Weil, Gotshal & Manges LLP, of New York, New York (Theodore E. Tsekerides on the brief), for the defendants.

Skadden, Arps, Slate, Meagher & Flom LLP, of Boston, Massachusetts and Washington, D.C. (Matthew J. Matule, John H. Beisner, and Geoffrey M. Wyatt on the brief), for the Chamber of Commerce of the United States of America, as amicus curiae.

DALIANIS, C.J.  The defendants, Exxon Mobil Corporation and ExxonMobil Oil Corporation (collectively, either Exxon or ExxonMobil), appeal from a jury verdict awarding approximately $236 million in damages due to groundwater contamination to the plaintiff, the State of New Hampshire, after a trial in Superior Court (Fauver, J.).  The State cross-appeals from the trial court's order imposing a trust upon approximately $195 million of the damages award.  We affirm the trial court's rulings on the merits and reverse its imposition of a trust.

I. Background

In 1990, Congress amended the Federal Clean Air Act to require the use of an "oxygenate" in gasoline in areas not meeting certain national air quality standards.  See 42 U.S.C. § 7545(k) (Supp. 1991) (amended 2005, 2007).  An oxygenate is a substance used to reduce gasoline emissions.  See Oxygenated Fuels Ass'n Inc. v. Davis, 331 F.3d 665, 666 (9th Cir. 2003).  The amendment did not mandate the use of any particular oxygenate; it simply required that "[t]he oxygen content of the gasoline shall equal or exceed 2.0 percent by weight."  42 U.S.C. § 7545(k)(2)(B).  To implement the requirement, the Environmental Protection Agency (EPA) launched the Reformulated Gasoline Program (RFG Program), which required gasoline containing an oxygenate of the manufacturer's choice.  See 40 C.F.R. § 80.46(g)(9)(i) (2000).  Methyl tertiary butyl ether (MTBE) was one among several possible oxygenates.  Id. MTBE is a gasoline additive that increases the octane levels of fuels. Metropolitan areas with significant concentrations of ambient ozone were required to use reformulated gasoline.  See 42 U.S.C. § 7545(k).  Other areas, like New Hampshire, could opt in to the program to receive credit toward mandatory emissions reduction requirements.  See 42 U.S.C. § 7545(k)(6)(A).

New Hampshire joined the RFG Program in 1991, with respect to the State's four southern-most counties, effective January 1, 1995.  Between 1995 and 2006, gasoline with MTBE was sold throughout the State.  In 1997, employees at the New Hampshire Department of Environmental Services (DES) became aware that MTBE could pose increased risks to groundwater.  In 1998, studies from Maine and California raised concerns about MTBE.  In 1999, DES adopted regulations setting a maximum contaminant level for MTBE in drinking water and groundwater at 13 parts per billion (ppb).

In 2000, the EPA advised:

> MTBE is capable of traveling through soil rapidly, is very soluble in water . . . and is highly resistant to biodegradation . . . . MTBE that enters groundwater moves at nearly the same velocity as the groundwater itself. As a result, it often travels farther than other gasoline constituents, making it more likely to impact public and private drinking water wells. Due to its affinity for water and its tendency to form large contamination plumes in groundwater, and because MTBE is highly resistant to biodegradation and remediation, gasoline releases with MTBE can be substantially more difficult and costly to remediate than gasoline releases that do not contain MTBE.

Advance Notice of Intent to Initiate Rulemaking under the Toxic Substance Control Act to Eliminate or Limit the Use of MTBE as a Fuel Additive in Gasoline, 65 Fed. Reg. 16094, 16097 (Mar. 24, 2000).

In 2001, the Governor petitioned the EPA to allow the State to opt out of the RFG Program, but did not receive a reply until 2004. See Removal of the Reformulated Gasoline Program From Four Counties in New Hampshire, 69 Fed. Reg. 4903 (Feb. 2, 2004). In 2004, the legislature enacted legislation banning MTBE gasoline effective in 2007. See RSA 146-G:12 (2005) (repealed 2015). In 2005, Congress eliminated the oxygenate requirement and enacted a renewable fuels mandate to increase ethanol usage. See Energy Policy Act of 2005, Pub. L. No. 109-58, §§ 1501, 1504, 119 Stat. 594, 1067, 1076 (2005).

In 2003, New Hampshire sued several gasoline suppliers, refiners, and chemical manufacturers seeking damages for groundwater contamination allegedly caused by MTBE. Before trial, all defendants except Exxon settled with the State. After almost ten years of litigation, the case went to trial in 2013 on three causes of action: negligence; strict liability — design defect; and strict liability — failure to warn. After an approximately three-month trial, the jury found in favor of the State on all of its claims. The jury rejected Exxon's defenses that "in designing its MTBE gasoline, it complied with the state of the art"; that "the hazards posed by the use of MTBE in gasoline were obvious, or were known and recognized by the State"; and that Exxon "provided distributors with adequate warnings of the hazards of MTBE gasoline." The jury also found that Exxon failed to prove that "the actions of someone other than the State or ExxonMobil (which were not reasonably foreseeable to ExxonMobil) were the sole cause of the State's harm," that "the State committed misconduct that contributed to its harm," or that some or all of Exxon's fault should be allocated to certain nonparties.

The jury awarded total damages in the amount of $816,768,018. These damages included: (a) $142,120,005 for past cleanup costs; (b) $218,219,948

to assess and clean up 228 high-risk sites; (c) $305,821,030 for sampling drinking water wells; and (d) $150,607,035 for treating drinking water wells contaminated with MTBE at or above the maximum contaminant level. The jury found that Exxon's market share for gasoline in New Hampshire during the applicable time period was 28.94%. Accordingly, the trial court entered an amended verdict of $236,372,644 against Exxon. The trial court subsequently awarded the State prejudgment interest in accordance with RSA 524:1-b (2007).

On appeal, Exxon contends that: (1) the State's suit should have been dismissed on the grounds of separation of powers and due process; (2) the suit should have been dismissed due to waiver; (3) the State's claims are preempted by the 1990 amendments to the Federal Clean Air Act; (4) the State failed to establish that Exxon departed from the applicable standard of care; (5) Exxon did not have a duty to warn the State; (6) market share liability is not an acceptable theory of recovery; (7) the State should not have been permitted to rely upon aggregate statistical evidence; (8) Exxon was unfairly prejudiced in its ability to present evidence of fault on the part of other nonparties; (9) the trial court erred in deciding the State had parens patriae standing; (10) the State's damages claims for future well impacts are not ripe; and (11) the trial court erred in awarding prejudgment interest on future costs.

## II. Separation of Powers and Due Process

Exxon argues that the State's suit should have been dismissed on the grounds of separation of powers and due process. Exxon asserts that based upon the State's decision to participate in the RFG Program beginning in 1991, and the legislature's failure to ban MTBE before 2007, "[t]he retroactive no-MTBE duty" imposed upon it "conflicts with bedrock principles of the separation of powers" and "due process." Exxon also argues that the suit conflicts with the Oil Discharge and Disposal Cleanup Fund (ODD Fund), RSA ch. 146-D (Supp. 2014); see Laws 2014, 177:1 (repealing RSA chapter 146-D, eff. July 1 2025), and the Gasoline Remediation and Elimination of Ethers Fund (GREE Fund), RSA ch. 146-G (Supp. 2014); see Laws 2014, 177:3, I (repealing RSA chapter 146-G, excluding RSA 146-G:9, eff. July 1, 2025), Laws 2014, 177:3, II (repealing RSA 146-G:9, eff. October 1, 2025). The State asserts that Exxon failed to preserve its separation of powers argument because the arguments it raises on appeal were not made to the trial court, and that Exxon fails to identify where it preserved its due process argument.

The appealing party bears the burden of demonstrating that it "specifically raised the arguments articulated in [its appellate] brief before the trial court." Dukette v. Brazas, 166 N.H. 252, 255 (2014). Generally, the failure to do so bars a party from raising such claims on appeal. N. Country Envtl. Servs. v. Town of Bethlehem, 150 N.H. 606, 619 (2004). But see Sup. Ct. R. 16-A (plain error rule). We have reviewed the record and agree with the

4

State that Exxon failed to preserve its separation of powers argument concerning the State's purported public policy decisions, as well as its due process argument. However, we address, as properly preserved, Exxon's separation of powers argument based upon the ODD and GREE Funds.

Before trial, Exxon moved for summary judgment on separation of powers grounds, arguing that the State's suit threatened to usurp the legislature's appropriations power because the ODD and GREE Funds "embody the legislative choice regarding how testing and remediation should be funded" and "this suit would allow the Attorney General to fund remediation in a very different way and create an appropriation outside of the General Court's purview." Exxon asserted that, because "there is no existing statutory mechanism through which any damages awarded to the State in this litigation could be specifically appropriated to the investigation, testing, and remediation the State requests," it would violate separation of powers for the court or the attorney general "to order such an appropriation." Thus, Exxon argued, "[i]n light of the existing funds and their structure, this suit implicates appropriations-related separation of powers problems."

The trial court denied the motion, concluding that Exxon had failed to establish that the legislature intended the ODD or GREE Funds to be the State's exclusive remedy. As to the ODD Fund, the court found that pursuant to the plain language of RSA 146-D:6, I, and I-a, the Fund "is only authorized to disburse funds to owners of underground storage facilities, bulk storage facilities, or the land on which such facilities are stored" and, thus, the statute did not demonstrate legislative intent "to provide a remedy for the damages sought by the State in this litigation." As to the GREE Fund, although noting that it does not contain an explicit limitation upon who may seek payment, because the potential damages at issue in this suit far exceed the $2,500,000 capped balance of the fund, the trial court stated that

> [i]t is reasonable to infer, then, that in creating the GREE Fund the legislature did not intend it to serve as the sole source of cleanup funds for any and all contamination event[s]. Its relatively small size indicates that it was intended to address a small number of isolated incidents at any given time, not a statewide contamination of the type alleged here by the State. Finally, the Court notes that neither fund claims to be an exclusive remedy.

Accordingly, the court found that "the existence of these funds does not evince the intent of the legislature to preclude suits such as this one" and that "the State's suit does not threaten to usurp the legislature's appropriations power."

On appeal, Exxon argues that the legislature "created two detailed statutory schemes—the ODD Fund and the GREE Fund—to enable direct spillers to pay the often substantial costs of remediation," and that "[i]t is

5

precisely when the legislature has established a tailored regulatory framework to address a particular problem that this Court has declined to make judicial 'improvements' to the democratically-enacted scheme." The State argues that its suit "is consistent with the ODD and GREE funds" in that the "caps on those funds, their purposes, and their structures confirm that neither was intended to replace recovery actions for tortious activity against manufacturers of dangerous products or to free manufacturers that withhold knowledge of a dangerous condition from liability."

Whether the State's lawsuit violates the Separation of Powers Clause of the State Constitution, N.H. CONST. pt. I, art. 37, because it conflicts with the ODD and GREE Funds, is a question of law, which we review de novo. See Cloutier v. State, 163 N.H. 445, 451 (2012). "The separation of powers among the legislative, executive and judicial branches of government is an important part of its constitutional fabric." Duquette v. Warden, N.H. State Prison, 154 N.H. 737, 746 (2007). "Separation of the three co-equal branches of government is essential to protect against a seizure of control by one branch that would threaten the ability of our citizens to remain a free and sovereign people." Id. Thus, under the Separation of Powers Clause, "each branch is prohibited . . . from encroaching upon the powers and functions of another branch." Id. at 746-47. Nevertheless, Part I, Article 37 does "not provide for impenetrable barriers between the branches . . . and the doctrine is violated only when one branch usurps an essential power of another." Id. at 747 (citation omitted).

Statutory interpretation is a question of law, which we review de novo. Appeal of Local Gov't Ctr., 165 N.H. 790, 804 (2014). In matters of statutory interpretation, we are the final arbiter of the intent of the legislature, as expressed in the words of the statute considered as a whole. Id. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. Statutory "provisions barring [a] common law right to recover are to be strictly construed." Estate of Gordon-Couture v. Brown, 152 N.H. 265, 267 (2005). "If such a right is to be taken away, it must be expressed clearly by the legislature." Id. at 266.

The purpose of the ODD Fund is "to establish financial responsibility for the cleanup of oil discharge and disposal, and to establish a fund to be used in addressing the costs incurred by the owners of underground storage facilities and bulk storage facilities for the cleanup of oil discharge and disposal." RSA 146-D:1 (emphasis added). The ODD Fund allows owners of eligible facilities to apply for reimbursement of court-ordered damages to third parties for injury or property damage and costs of cleanup of oil discharges up to $1,500,000. RSA 146-D:6, III. The ODD Fund is financed by a fee on imported oil that is paid on

a per gallon basis by distributors who import oil into New Hampshire. RSA 146-D:2-:3. As the trial court found, "the end goal of the ODD Fund is not to offset tort liability for Defendants but rather to provide an excess insurance mechanism for [underground storage tank] owners who are otherwise in compliance with all relevant laws and rules."

The purpose of the GREE Fund, a fund in addition to both the Oil Pollution Control Fund established pursuant to RSA 146-A:11-a (Supp. 2014) and the ODD Fund, "is to provide procedures that will expedite the cleanup of gasoline ether spillage, mitigate the adverse [e]ffects of gasoline ether discharges, encourage preventive measures, impose a fee upon importers of neat gasoline ethers into the state and establish a fund for the remediation of groundwater and surface water contaminated by gasoline ethers." RSA 146-G:1, II. "Th[e GREE] nonlapsing, revolving fund shall be used . . . . to mitigate the adverse [e]ffects of gasoline ether discharges including, but not limited to, provision of emergency water supplies to persons affected by such pollution, and . . . the establishment of an acceptable source of potable water to injured parties." RSA 146-G:4, I. "Not more than $150,000 shall be allocated annually for research programs dedicated to the development and improvement of preventive and cleanup measures concerning such gasoline ether discharges." Id. The fund's balance is capped at $2,500,000. RSA 146-G:4, II. The fund is financed in part by the ODD Fund. RSA 146-D:3, VI(b); RSA 146-G:1.

We agree with the trial court that there is no language in either of the statutory provisions establishing the ODD and GREE Funds indicating a legislative intent to preclude the damages sought by the State in this case. See also State v. Hess Corp., 161 N.H. 426, 431 (2011) (MTBE defendants conceded that the State may recover damages to test and treat statutorily defined public water systems). Accordingly, we reject Exxon's separation of powers argument based upon the ODD and GREE Funds.

III. Waiver

Exxon argues that the State's suit should have been dismissed due to waiver. Before trial, Exxon moved for summary judgment, arguing, in part, that "by requiring that RFG . . . gasoline be sold in New Hampshire, with full knowledge that such gasoline would contain MTBE and with full knowledge of all of MTBE's alleged defective properties, the State cannot now be allowed to sue Defendants who thereafter complied with the State's demands and supplied MTBE gasoline to the State." (Quotation omitted.) In denying the motion, the trial court noted that, because Exxon did not assert that the State expressly waived its right to sue for harm from MTBE, Exxon could only proceed under an implied waiver theory. The court found that there were "genuine issues of disputed fact regarding the State's knowledge, [Exxon's] knowledge, and timing of this awareness."

7

Following the jury verdict, Exxon moved to set aside the verdict and for a new trial. Exxon argued, in part, that it was "unfairly prejudiced" when the trial court instructed the jury on waiver in its preliminary instructions "but then refused to include that instruction in its final instructions or in the verdict form." In its order denying Exxon's motion, the trial court explained:

> In its motion for summary judgment on waiver, Exxon argued that the State knew MTBE's characteristics but still opted in to the RFG program, thereby waiving any claims it had or would develop regarding MTBE contamination. However, the State disputed its level of knowledge. During trial, Exxon attempted to prove the State's knowledge by presenting witnesses that testified that MTBE's characteristics were widely known and understood thereby suggesting the State should have known about MTBE.

> The State countered this testimony with its own witnesses explaining that the first time State employees found MTBE in a contamination site, those employees were unable to identify the compound and asked the U.S. EPA for assistance. The State also presented testimony that it did not become aware of MTBE's full nature until the State of Maine published a study.

> This testimony goes to the issue of waiver but it is also relevant to the issue of [the State's] misconduct, and the Court gave an instruction on [the State's] misconduct. In fact, the Court instruction on [the State's] misconduct encompassed the same elements embodied in a waiver claim.

(Citations omitted.)

On appeal, Exxon argues that, "with knowledge of MTBE groundwater risks, the State opted-in to the RFG program, participated in that program for years, repeatedly opposed banning MTBE, and ultimately decided in 2004 that continuing MTBE's use for nearly three more years was better for the State than an outright ban." Thus, there was "ample evidence to support a jury verdict finding waiver," and the trial court's "failure to instruct the jury is clear error." Exxon also argues that the trial court's reasoning that a waiver instruction was unnecessary is erroneous, "as misconduct and waiver are distinct defenses that are appropriately charged separately." The State argues that, at trial, Exxon adduced no evidence of express or implied waiver, that the special verdict form reflects that the jury rejected Exxon's defense "that the hazards posed by the use of MTBE in gasoline were obvious, or were known and recognized by the State," and that, in any event, the trial court "correctly concluded that its misconduct instruction adequately encompassed Exxon's waiver defense."

8

Whether a particular jury instruction is necessary and the exact scope and wording of jury instructions are within the sound discretion of the trial court. See State v. Littlefield, 152 N.H. 331, 334 (2005). We review the trial court's decisions on these matters for an unsustainable exercise of discretion. Id.

Exxon's "plaintiff's misconduct defense" jury instruction as given by the trial court provided in pertinent part:

> If you find that ExxonMobil's product was unreasonably dangerous, ExxonMobil failed to provide a warning, or behaved negligently and that ExxonMobil is liable, you should then go on to determine if the State committed misconduct that contributed to cause its injuries. With respect to the State's alleged misconduct, ExxonMobil bears the burden to prove that it is more likely than not that the State committed misconduct in its use of the product.

> Misconduct includes, but is not limited to, abnormal use of the product, misuse of the product, failing to discover or foresee dangers that the ordinary person or entity would have discovered or foreseen, voluntarily proceeding to encounter a known danger, and failing to mitigate damages.

(Emphasis added.)

We note that in its motion for judgment notwithstanding the verdict (JNOV) following the jury verdict, Exxon made the same argument regarding its misconduct defense that it makes on appeal regarding waiver. Asserting in its motion for JNOV that the evidence "overwhelmingly proved ExxonMobil's affirmative defenses," Exxon argued that "[t]he evidence at trial overwhelmingly proves that the State's misconduct contributed to its injuries. First, the evidence established that the State voluntarily encountered a known danger by opting-in to the RFG program with knowledge of MTBE's characteristics. Moreover, the evidence demonstrates that the State knew that MTBE would be used in New Hampshire to comply with the RFG program." (Citation omitted.) In support of its waiver argument on appeal, Exxon asserts that "with knowledge of MTBE groundwater risks, the State opted-in to the RFG program [and] participated in that program for years."

Concluding that the waiver and misconduct instructions are similar because they both address the State's knowledge and subsequent actions based upon that knowledge, the trial court reasoned:

> Depending on the State's knowledge, the jury could have found that the State knew or should have known the characteristics of MTBE gasoline and thereby either waived any

9

challenge it is now raising or should have been held partially responsible for its own injury. In other words, because the jury was instructed on and considered the issue of the State's knowledge—that the State knew of MTBE and used it anyway—the jury also considered whether the State waived any claims about MTBE contamination risks by knowingly using MTBE. The jury nonetheless rejected this theory. Thus, Exxon was not entitled to an independent waiver instruction because the plaintiff's misconduct instruction encompassed this affirmative defense.

Assuming, without deciding, that there was enough evidence for Exxon's implied waiver defense to go to the jury, we hold that any error was harmless given the jury's finding that the State did not commit misconduct that contributed to its harm.

IV. Federal Preemption

Exxon argues that the State's claims are preempted by the Federal Clean Air Act. Before trial, Exxon moved for summary judgment, arguing that Congress and the EPA "took actions providing that federal requirements were to be met by allowing refiners to choose MTBE as an additive to gasoline," and that "State law is preempted where it seeks to ban an action that federal law affirmatively chooses to make available to state actors." The trial court rejected Exxon's argument that the State's tort claims present an obstacle to the federal purpose of the Clean Air Act.

Noting that "[o]n numerous occasions, courts throughout the United States have considered whether the [Clean Air Act] preempts state tort law claims regarding the use of MTBE," the trial court applied the reasoning of the United States District Court for the Southern District of New York. The trial court explained that Exxon's arguments

> are essentially identical to those made by the defendants during In re MTBE Products Liability Litigation. Here, the Defendants claim that the federal regulation deliberately provided manufacturers with a range of oxygenate choices and the choice was designed to further the regulation's objectives. The Defendants further argue that Congress and the EPA stressed the importance of MTBE as a choice and encouraged its use. Finally, they point to the lengthy legislative history of the [Clean Air Act] to support their arguments.

See In re Methyl Tertiary Butyl Ether (MTBE) Products, 457 F. Supp. 2d 324, 336-42 (S.D.N.Y. 2006), aff'd, 725 F.3d 65 (2d Cir. 2013), cert. denied, 134 S. Ct. 1877 (2014). The trial court concluded that "[l]ike the defendants [in MTBE Products], the Defendants here have failed to prove that the State's tort law

claims are preempted by the [Clean Air Act], and their use of the legislative history is irrelevant due to the unambiguous language of the [Act]."

Exxon moved for a directed verdict at the close of the State's case-in-chief, based in part upon its assertion that the evidence presented "demonstrates that the State's claims are preempted based on the Clean Air Act's requirement that gasoline contain an oxygenate and the factual evidence demonstrating that no feasible alternative oxygenate existed sufficient to meet the requirements of RFG in New Hampshire." Noting that Exxon's argument "is presented in a highly summary fashion," the trial court declined to revisit the preemption claim and relied upon its earlier decision denying Exxon's motion for summary judgment.

After the jury verdict, Exxon moved to set aside the verdict and for a new trial arguing, in part, that the trial court "failed to instruct the jury on ExxonMobil's affirmative defense of preemption or include it in the verdict form." According to Exxon, the trial court erred because "there were sufficient facts" to support its argument "that MTBE was the only feasible oxygenate for use in New Hampshire" and, therefore, "the State's claim would be preempted because ExxonMobil was required to use an oxygenate under the Clean Air Act Amendments." Exxon asserted also that "as a matter of law, the State's claims were preempted . . . because Congress specifically intended for refiners to be able to choose among oxygenates, including MTBE, to comply with the RFG program and eliminating MTBE would have interfered with the goals of the [Act]."

Noting that "[t]he preemption argument Exxon raises directly alleges the argument it raised pretrial and in its directed verdict motion," the trial court denied the motion. The court reasoned that

> [t]o the extent Exxon argues the jury should have been instructed on preemption in order to find facts from which the Court could further evaluate preemption, the Court considered and rejected this argument in its [order denying Exxon's motion for a directed verdict]. Even assuming New Hampshire courts would adopt this view of preemption, there are no facts to support Exxon's theory. Exxon alleges the State's claims are preempted by the federal Clean Air Act and its RFG program. The Court rejected this legal argument. There are no facts that a jury could find that would alter the legal analysis this Court already undertook.

(Citation omitted.)

On appeal, Exxon argues that a state tort duty holding it liable for supplying MTBE is preempted by the Clean Air Act, "particularly because Exxon had no safer, feasible alternative to MTBE at the time." According to

11

Exxon, "[p]reemption here follows a fortiori from" Geier v. American Honda Motor Co., 529 U.S. 861 (2000), and Williamson v. Mazda Motor of America, Inc., 562 U.S. 323 (2011), "which establish that when federal law imposes a mandate but leaves private parties with a choice of how to comply, a state-law tort duty that would take one option off the table obstructs federal objectives when maintaining the choice is a 'significant objective' of the federal program." Exxon asserts that despite "ample evidence that there was no safer, feasible alternative to MTBE," the trial court erroneously refused to instruct the jury on this issue. The State argues that "[p]reemption arguments like the one Exxon raises here have been rejected by every federal court of appeals to consider them." The State contends that "enabling suppliers to choose MTBE (as opposed to ethanol) was not a significant regulatory objective of Congress or EPA," and that the trial evidence demonstrated that "safer, feasible alternatives to MTBE existed." (Quotations omitted.)

Because the trial court's determination of federal preemption is a matter of law, our review is de novo. N.H. Attorney Gen. v. Bass Victory Comm., 166 N.H. 796, 801 (2014). The federal preemption doctrine is based upon the Supremacy Clause of the United States Constitution. See Arizona v. United States, 132 S. Ct. 2492, 2500 (2012); see also Appeal of Sinclair Machine Prod's, Inc., 126 N.H. 822, 826 (1985). Article VI provides that federal law "shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. CONST. art. VI. "Accordingly, it has long been settled that state laws that conflict with federal law are without effect." Mutual Pharmaceutical Co., Inc. v. Bartlett, 133 S. Ct. 2466, 2473 (2013) (quotation omitted).

Congress may preempt state law under the Supremacy Clause in several ways. Hillsborough County v. Automated Medical Labs., 471 U.S. 707, 713 (1985). First, within constitutional limits, "Congress is empowered to pre-empt state law by so stating in express terms." Id. "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation." Id. (quotation omitted).

"Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." Id. This "conflict preemption" arises when "compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (quotations and citation omitted).

Exxon relies upon the so-called "obstacle branch" of conflict preemption — that state law "stand[s] as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress." Arizona, 132 S. Ct. at 2501 (quotation omitted). "The burden of establishing obstacle preemption . . . is heavy: the mere fact of tension between federal and state law is generally not enough to establish an obstacle supporting preemption, particularly when the state law involves the exercise of traditional police power." MTBE Products Liability Litigation, 725 F.3d 65, 101-02 (2d Cir. 2013) (quotations and brackets omitted), cert. denied, 134 S. Ct. 1877 (2014). "Indeed, federal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." Id. at 102 (quotation omitted).

"The control and elimination of water pollution is a subject clearly within the scope of the police power" of the State. Shirley v. Commission, 100 N.H. 294, 299 (1956). "Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (quotation, brackets, and ellipses omitted). "Accordingly, the purpose of Congress is the ultimate touchstone of pre-emption analysis." Id. (quotations and brackets omitted). "Since preemption of any type fundamentally is a question of congressional intent, our preemption analysis begins with the source of the alleged preemption." Bass Victory Comm., 166 N.H. at 803 (quotation, brackets, and citation omitted).

As discussed above, in 1990, Congress enacted amendments to the Clean Air Act that, among other things, created the RFG Program. See 42 U.S.C. § 7545(k). The RFG Program required gasoline used in specific geographic areas to have a minimum oxygen content, achieved by the addition of an oxygenate of the manufacturer's choice. See 42 U.S.C. §§ 7545(k)(2)(B), (m)(2); see also 40 C.F.R. § 80.46(g)(9)(i). After the passage of the amendments, the EPA certified various blends of gasoline for use in the RFG Program, including gasoline containing MTBE, but did not mandate the use of any one oxygenate. As the United States Court of Appeals for the Second Circuit explained,

> the 1990 Amendments did not require, either expressly or implicitly, that Exxon use MTBE. Although the 1990 Amendments required that gasoline in certain geographic areas contain a minimum level of oxygen, they did not prescribe a means by which manufacturers were to comply with this requirement. The EPA identified MTBE as one additive that could be used to "certify" gasoline, but certification of a fuel meant only that it satisfied certain conditions in reducing air pollution. Neither the statute

13

nor the regulations required Exxon to use MTBE, rather than other oxygenates, such as ethanol, in its gasoline.

MTBE Products Liability Litigation, 725 F.3d at 98 (citations omitted).

We disagree with Exxon that preemption here "follows a fortiori" from Geier and Williamson. Those cases both considered portions of Federal Motor Vehicle Safety Standard 208 (FMVSS 208), promulgated pursuant to the National Traffic and Motor Vehicle Safety Act of 1966. In Geier, a 1984 version of FMVSS 208 required manufacturers to equip their vehicles with passive restraint systems, but gave manufacturers a choice among several different passive restraint systems, including airbags and automatic seatbelts. Geier, 529 U.S. at 864-65, 875. The question before the United States Supreme Court was whether the Act, together with the regulation, preempted a state tort suit that would have held a manufacturer liable for not installing airbags. See id. at 865. In determining whether, in fact, the state tort action conflicted with federal law, the Court considered whether the state law stood as an "obstacle" to the objectives of the federal law. Id. at 886. After examining the regulation, including its history, the promulgating agency's contemporaneous explanation of its objectives, and the agency's current views of the regulation's preemptive effect, the Court concluded that giving auto manufacturers a choice among different kinds of passive restraint devices was a significant objective of the federal regulation. Id. at 874-83. Because the tort suit stood as an obstacle to the accomplishment of that objective in that the suit would have deprived the manufacturers of the choice among passive restraint systems that the federal regulation gave them, the Court found the state tort suit preempted. Id. at 886.

In Williamson, the Supreme Court considered a 1989 version of FMVSS 208 requiring that auto manufacturers install seatbelts on the rear seats of passenger vehicles. Williamson, 562 U.S. at 326. The law required manufacturers to install lap-and-shoulder belts on seats next to a vehicle's doors or frames but gave them a choice of installing either simple lap belts or lap-and-shoulder belts on rear inner seats. Id. The Court noted that like the regulation in Geier, the regulation at issue before it left the manufacturer with a choice and, like the tort suit in Geier, the tort suit at issue would restrict that choice. Id. at 332. However, after reviewing the history of the regulation before it, including the agency's explanation of the reasons for not requiring lap-and-shoulder belts for rear inner seats and the Solicitor General's representations of the agency's views, the Court concluded that providing manufacturers with this seatbelt choice was not a significant objective of the federal regulation. Id. at 334-36. Thus, the Court concluded that because the choice of the type of restraint was not a significant regulatory objective, the state tort suit was not preempted. Id.

14

Exxon does not point to any part of the Clean Air Act or its legislative history that supports a conclusion that the choice among oxygenate options was a significant objective of the federal law. Indeed, "[t]he [Clean Air Act] itself contains no language mandating that [Exxon] have a choice among oxygenates." In re Methyl Tertiary Butyl Ether (MTBE) Products, 457 F. Supp. 2d at 336-37. Unlike Geier, in which the federal regulation deliberately provided the manufacturer with a range of choices among different passive restraint devices, "[h]ere, the choice of oxygenate options is a means towards improving air quality, and the existence of the choice itself is not critical to furthering that goal." MTBE Products Liability Litigation, 725 F.3d at 98 n.15. "Geier does not stand . . . for the proposition that any time an agency gives manufacturers a choice between two or more options, a tort suit that imposes liability on the basis of one of the options is an obstacle to the achievement of a federal regulatory objective and may be pre-empted." Williamson, 562 U.S. at 337 (Sotomayor, J., concurring). Rather, "a conflict results only when [the regulation] . . . does not just set out options for compliance, but also provides that the regulated parties must remain free to choose among those options." Id. at 338 (quotation omitted).

We reject Exxon's argument that "[d]espite ample evidence that there was no safer, feasible alternative to MTBE," the trial court's refusal to instruct the jury on this issue was error because "preemption questions can be informed by questions of fact." Exxon asserts that "[a]t the summary judgment stage, the [trial court] rejected the purely legal argument that the State's claims would be preempted even if there were safer, feasible alternatives, but later . . . refused to consider the different and fact-dependent question whether preemption would apply if Exxon had no safer, feasible alternative." (Citation omitted.)

The record shows, however, that Exxon's proposed jury instruction did not ask the jury to find whether there was no safer feasible alternative to MTBE. Rather, the proposed instruction asked "whether prohibiting the use of MTBE in gasoline during the period at issue here would have resulted in delays and increased costs to the expansion of the federal RFG program," thus establishing preemption. (Emphasis added.) This position has been rejected as a matter of law. See MTBE Products Liability Litigation, 725 F.3d at 103 (although legislative materials demonstrate that Congress was sensitive to the magnitude of the economic burdens it might be imposing by virtue of the RFG Program, "they hardly establish that Congress had a 'clear and manifest intent' to preempt state tort judgments that might be premised on the use of one approved oxygenate over a slightly more expensive one"); Oxygenated Fuels Ass'n Inc., 331 F.3d at 673 (plaintiff "offered virtually no support for its assertion that the Clean Air Act's goals—for purposes of preemption analysis— are a smoothly functioning market and cheap gasoline").

We agree with several other courts that have addressed and rejected the issue of preemption and MTBE. See, e.g., MTBE Products Liability Litigation,

725 F.3d at 100-03 (rejecting Exxon's obstacle branch preemption arguments); In re Methyl Tertiary Butyl Ether (MTBE) Products, 739 F. Supp. 2d at 601-02 (allowing plaintiffs to recover damages for inordinate environmental effects caused by the use of MTBE does not conflict with federal policy, and rejecting Exxon's arguments that because there was no safer, feasible alternative to MTBE, it was impossible for Exxon to comply with federal requirements without using MTBE); In re Methyl Tertiary Butyl Ether (MTBE) Products, 457 F. Supp. 2d at 343 ("Just as the many other courts that have addressed the issue of preemption and MTBE, this Court finds that plaintiffs' tort law claims are not preempted."); Oxygenated Fuels Ass'n, Inc. v. Pataki, 293 F. Supp. 2d 170, 172, 182-83 (N.D.N.Y. 2003) (concluding after bench trial that New York MTBE ban does not conflict with any aspect of Clean Air Act); Exxon Mobil Corp. v. U.S. E.P.A., 217 F.3d 1246, 1256 (9th Cir. 2000) (Nevada regulation requiring that all gasoline sold in wintertime have an oxygen content of at least 3.5 percent does not conflict with, and is not preempted by, any provision of the Clean Air Act); Abundiz v. Explorer Pipeline Co., No. CIV. 3:00-CV-H, 00-2029, 2002 WL 1592604, at *3-5 (N.D. Tex. July 17, 2002) (Geier does not compel a finding that state MTBE regulations are preempted).

We hold as a matter of law that the State's claims are not preempted by federal law, and that the trial court did not err in refusing Exxon's proposed jury instruction.

V. Standard of Care

Exxon argues that the State failed to establish that it departed from the applicable standard of care "simply by marketing MTBE." In its motion for a directed verdict at the close of the State's case-in-chief, Exxon argued that "[i]n order to establish that ExxonMobil breached its duty of care, the State was obligated to present evidence that ExxonMobil failed to act pursuant to what reasonable prudence would require under similar circumstances." (Quotation omitted.) Exxon asserted that, because the evidence presented at trial "demonstrated that the entire industry acted in the same manner in using gasoline containing MTBE in New Hampshire," there was "no evidence to establish the standard of care or what a reasonable manufacturer or supplier would have done, let alone that ExxonMobil deviated from any applicable standard of care."

The trial court denied Exxon's motion, rejecting its argument that because the State did not present evidence regarding the care exercised by other manufacturers and refiners in the industry, the State failed to show that Exxon's actions were unreasonable. The court stated:

> In fact, the State presented testimony from Duane Bordvick regarding the risk-benefit analysis his company, Tosco—another manufacturer during the relevant time period of this case—

16

conducted. Bordvick testified that Tosco decided not to use MTBE because of the unique and increased risks Tosco perceived MTBE to have. This testimony not only directly contradicts Exxon's argument that the State failed to show the care exercised by other members of the refining industry, it also serves as some evidence from which a jury could conclude that Exxon's behavior in selecting MTBE as its RFG formula oxygenate and doing so without providing a warning was unreasonable.

(Citations omitted.) The trial court also rejected, as unsupported by the record, Exxon's argument that it could not have foreseen all manners in which the State's alleged harm occurred. The court stated:

The State admitted Barbara Mickelson's memorandum to Exxon that demonstrates Exxon received warnings against the use of MTBE—that MTBE would take longer and cost more to remediate than traditional gasoline spills. Other witnesses corroborated Exxon's possession of information regarding the expense associated with MTBE remediation as early as the 1980s. In this way, a reasonable jury could conclude that Exxon should have foreseen the harm the State now alleges—increased remediation costs of a different nature than those associated with traditional gasoline.

(Citations omitted.)

Following the jury verdict, Exxon moved for JNOV, arguing, in part, that "there is no evidence in the record regarding the standard of care for a reasonably prudent refiner or manufacturer or what actions ExxonMobil took that breached a standard of care" when the decision to use MTBE was made. Exxon asserted that it presented testimony showing that it "carefully considered the use of MTBE," including consulting with "[a]t least nine different groups within Exxon" to gain information, and that "[o]ther gasoline refiners and manufacturers agreed with Exxon's assessment that the RFG program's requirements could not have been met without the use of MTBE in addition to ethanol." Noting that it had previously rejected Exxon's arguments in its directed verdict ruling, the trial court relied upon that ruling in declining to consider these arguments again "[b]ecause Exxon raises no new facts or law."

On appeal, Exxon argues that the State "offered no evidence to support the notion that a reasonable supplier in New Hampshire would never have used MTBE at any time" and that "[w]ithout a relevant standard against which to compare Exxon's conduct, the State's negligence claim . . . fails as a matter of state law." According to Exxon, the State failed to establish that it departed from the applicable standard of care simply by marketing MTBE, asserting that "the evidence presented at trial showed that manufacturers overwhelmingly

17

complied with the RFG program in the Northeast by using MTBE because there was no safer, feasible alternative." The State argues that "[t]he record contains ample evidence that Exxon breached the standard of care," the trial court properly instructed the jury regarding the duty of care, and the jury found Exxon negligent.

Weighing the evidence is a proper function of the factfinder. 93 Clearing House, Inc. v. Khoury, 120 N.H. 346, 350 (1980). The trier of fact is in the best position to measure the persuasiveness of evidence and the credibility of witnesses. Id. Factual findings "will not be disturbed unless . . . erroneous as a matter of law or unsupported by the evidence." Great Lakes Aircraft Co. v. City of Claremont, 135 N.H. 270, 287 (1992) (quotations omitted); see Sutton v. Town of Gilford, 160 N.H. 43, 55 (2010). "A fact finder has the discretion to evaluate the credibility of the evidence and may choose to reject that evidence in whole or in part." Society Hill at Merrimack Condo. Assoc. v. Town of Merrimack, 139 N.H. 253, 256 (1994). Our task is to determine whether a reasonable person could reach the same conclusion as the jury on the basis of the evidence before it. See Shaka v. Shaka, 120 N.H. 780, 782 (1980). We review sufficiency of the evidence claims as a matter of law. Tosta v. Bullis, 156 N.H. 763, 767 (2008).

The test of due care is what reasonable prudence would require under similar circumstances. Carignan v. N.H. Int'l Speedway, 151 N.H. 409, 414 (2004). Whether the defendant breached that duty of care is a question for the trier of fact. Id. "[N]ot every risk that might be foreseen gives rise to a duty to avoid a course of conduct; a duty arises because the likelihood and magnitude of the risk perceived is such that the conduct is unreasonably dangerous." Millis v. Fouts, 144 N.H. 446, 449 (1999) (quotation omitted). "[C]onformity with industry practice is not an absolute defense to liability under New Hampshire law, because entire industries may lag behind the standard of care. But it is nonetheless a factor that the jury may consider in evaluating negligence claims." Bartlett v. Mutual Pharmaceutical Co., Inc., 742 F. Supp. 2d 182, 189 (D.N.H. 2010) (quotation and citation omitted); see Bouley v. Company, 90 N.H. 402, 403 (1939) (the test of due care is not custom or usage, but what reasonable prudence would require under the circumstances).

The record supports that in April 1984, an Exxon employee stated in an internal memo that "we have . . . ethical and environmental concerns [about MTBE] that are not too well defined at this point." The memo explained that as there were "strong economic incentives to use MTBE, a study should be started [to] thoroughly review the issues with management." In August 1984, Exxon asked an in-house environmental engineer, Barbara Mickelson, for "information on additional potential ground water contamination problems that are associated with the use of MTBE in gasoline." Mickelson stated that "MTBE when dissolved in ground water, will migrate farther than [another gasoline additive] before soil attenuation processes stop the MTBE migration."

She explained that the "[s]mall household carbon filtration units . . . used by Exxon to treat private drinking supplies contaminated by [another gasoline additive] . . . would not provide adequate treatment for water supplies additionally contaminated by MTBE." Mickelson concluded that "the number of well contamination incidents is estimated to increase three times following the widespread introduction of MTBE into Exxon gasoline" and that "the closing-out of these incidents would take longer and treatment costs would be higher by a factor of 5." In 1985, Mickelson recommended that "from an environmental risk point of view MTBE not be considered as an additive to Exxon gasolines on a blanket basis throughout the United States" because of its unique contaminating properties.

In the 1980s, Exxon joined the MTBE Committee, an industry group that was formed to address "environmental issues" and "federal and state regulatory issues" relating to MTBE. In a December 1986 meeting with MTBE Committee members, including Exxon, the EPA expressed concern about MTBE leaking into groundwater because MTBE, "which is very soluble in water, can find its way to drinking supplies (i.e. acqu[i]fers)." Nonetheless, in February 1987, the MTBE Committee represented to the EPA that

> there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is therefore not needed to develop such data.

After Congress amended the Clean Air Act in 1990 to require use of an oxygenate in gasoline, members of the American Petroleum Institute, an industry lobbying group that included Exxon, met with New Hampshire officials and encouraged them to opt in to the RFG Program. During those meetings, it was not disclosed that oil companies would use MTBE in RFG Program gasoline. Robert Varney, who was the commissioner of DES during the relevant time, testified that, although Exxon knew as early as 1984 about MTBE groundwater contamination issues, Exxon did not warn the State or provide it with any information about those issues before Varney recommended that the State opt in to the RFG Program in 1991 or before he recommended that it remain in the Program in 1997. He also testified that the State would not have opted in to the RFG Program if DES had known the information contained in Mickelson's 1984 memo.

In 1999, Exxon had identified more than 100 known contamination sites in New England, many polluted solely with MTBE. That same year, a study by Exxon on the costs of cleaning up MTBE noted that spills containing MTBE could be more difficult and costly to clean up because MTBE "is more soluble

[in water] and less biodegradable than other gasoline components." The study found that "[c]ost increases related to MTBE are significant for . . . New England" due in part to "hydrogeologic site conditions which maximize the potential for MTBE to 'travel' and impact receptors (e.g., shallow groundwater, fractured bedrock, a high density of private potable wells)." In 2000, Exxon employees observed in an internal communication that "industry has not demonstrated the ability to stop leaks and spills to the level required to avoid MTBE concentrations that effect [sic] the taste and odor in drinking water," that "non MTBE fuel leaks are more managable [sic]," and that "[b]ased on experience in [the] US, it is fair to assume that other places using MTBE will eventually find groundwater contamination."

Duane Bordvick, a former senior vice-president for safety, health and environment at Tosco Corporation, a gasoline refinery in California, testified that in 1997 he made a statement on behalf of Tosco that the company had decided "that long-term use of MTBE was not in the best interest of" the company or its shareholders due to the "potential threat to California's drinking water resources and the associated liability . . . for restoring water resources." He testified that that conclusion was drawn based upon several factors including: "the growing evidence on the threat of MTBE contamination and evidence related to the difficulty of cleaning up MTBE"; "the cost associated [with] potentially having to participate in replacement of drinking water to cities"; "the potential liability for the use of MTBE, associated legal costs, [and] potential lawsuits that may result"; and the "likelihood" that those costs "would exceed . . . whatever costs may be associated with no longer relying on MTBE in [Tosco's] gasoline," including refinery changes and other equipment changes.

As the trial court instructed the jury:

> Negligence is the failure to use reasonable care. Reasonable care is the degree of care that an ordinary, prudent manufacturer or supplier would use under the same or similar circumstances.

> The failure to use reasonable care may take the form of action or inaction. That is, negligence may consist of either: doing something that an ordinary, prudent manufacturer or supplier would not do under the same or similar circumstances; or, failing to do something that an ordinary, prudent manufacturer or supplier would do under the same or similar circumstances.

> A manufacturer or supplier has a duty to make inspections or tests that are reasonably necessary to see that its product is safe for its intended use and for any other reasonably foreseeable purpose.

Viewed in the light most favorable to the State, we hold that the record contains sufficient evidence to support a finding that Exxon breached the standard of care by acting unreasonably under the circumstances. Accordingly, we uphold the trial court's rulings.

VI. Duty to Warn

Exxon argues that it did not have a duty to warn the government as sovereign, rather than as end user or consumer, of the characteristics of MTBE gasoline.  In 2008, Exxon moved to dismiss the State's failure-to-warn claim, alleging that when the State claims that, as a bystander, it is a consumer of MTBE, and is therefore entitled to bring a products liability claim, it improperly expands the definition of "consumer," and that the State should be classified as a third party bystander.  Because New Hampshire does not recognize bystander liability claims, Exxon argued that the State's strict liability claims should be dismissed.

The trial court denied the motion, finding that the State's claim regarding Exxon's alleged failure to warn of its defective product had been properly pleaded.  Based upon RSA 481:1 (2013), the court concluded that because the State "holds the waters of New Hampshire in trust for the public," the State had properly alleged that "the defendants may be sought to be held liable for damage to the State's waters."  The trial court rejected the argument that "the State's interests in its water are akin to those of a bystander."  Several years later, Exxon moved for summary judgment on the State's failure-to-warn claim, arguing that because the State was not a "user" or "consumer" of MTBE it "cannot premise a failure-to-warn claim on [Exxon's] alleged failure to warn the State itself."  The trial court agreed with the State that the issue had already been addressed in the prior order on the motion to dismiss.

In its motion for a directed verdict at the close of the State's case-in-chief, Exxon argued, in part, that the State "failed to introduce evidence that ExxonMobil failed to warn 'users' of gasoline containing MTBE, instead focusing exclusively on ExxonMobil's alleged failure to warn the State as a regulatory entity, not as a user."  The trial court rejected Exxon's arguments, stating that "the State is the party who—if a jury determined a warning was required—would have been owed the warning."  The court explained that "[t]he State, as the consumer and in its parens patriae capacity, was an end user of MTBE gasoline.  This Court has previously ruled the State has standing to assert claims brought on behalf of the people of New Hampshire.  Additionally, the State is a consumer itself."

On appeal, Exxon argues that "[t]he theory that there is a duty to warn the sovereign qua sovereign" is "wholly unprecedented, oversteps longstanding limitations of New Hampshire tort law, and raises serious First Amendment difficulties."  The State argues that "although Exxon contends that the verdict

21

hinges on the State's status as sovereign, the trial evidence clearly demonstrated that Exxon provided no warning about MTBE to anyone" and that Exxon, thus, "failed to warn the State as regulator, the State as an end user, or the citizenry represented by the State as parens patriae." We agree with the State.

The General Court has declared that the State is the trustee over all of the State's water. Pursuant to RSA 481:1,

> an adequate supply of water is indispensable to the health, welfare and safety of the people of the state and is essential to the balance of the natural environment of the state. Further, the water resources of the state are subject to an ever-increasing demand for new and competing uses. The general court declares and determines that the water of New Hampshire whether located above or below ground constitutes a limited and, therefore, precious and invaluable public resource which should be protected, conserved and managed in the interest of present and future generations. The state as trustee of this resource for the public benefit declares that it has the authority and responsibility to provide careful stewardship over all the waters lying within its boundaries.

RSA 481:1. As trustee, the State can bring suit to protect from contamination the waters over which it is trustee. Hess, 161 N.H. at 432.

In State v. City of Dover, 153 N.H. 181 (2006), we determined that the State was the proper party to bring suit against the MTBE defendants, because it "has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." City of Dover, 153 N.H. at 186. In addition, we concluded that the State satisfied the requirements of parens patriae standing because it asserted an injury to a quasi-sovereign interest, and alleged injury to a substantial segment of its population. Id. at 187-88. "[A] state may act as the representative of its citizens where the injury alleged affects the general population of a State in a substantial way." Hess, 161 N.H. at 433 (quotation omitted). Accordingly, we held that the State has parens patriae standing to bring suit against the MTBE defendants on behalf of the residents of New Hampshire. City of Dover, 153 N.H. at 187-88.

The jury was not instructed that Exxon owed a duty to the State as sovereign. Rather, the trial court instructed:

> In deciding whether there was a design defect in the product, you may consider whether there was a warning, and, if so, whether the warning was adequate. The warning is inadequate unless it

22

makes the potential harmful consequences apparent and contains specific language directed at the significant risks or dangers caused by a failure to use the product in the prescribed manner. The manner of the warning is inadequate unless it is of such intensity to cause a reasonable person to exercise caution equal to the potential danger.

. . . .

The State has the burden to prove that if ExxonMobil had provided an adequate warning, MTBE gasoline would not have been used or would have been used differently.

A failure to warn amounts to a legal cause of harm when the failure to warn is a substantial factor in bringing about the harm, and if the harm would not have occurred without the failure to warn. The failure to warn need not be the only cause of the injury, but it must be a substantial factor in bringing about the injury.

We reject Exxon's argument that the State's failure-to-warn claim was improper because it was premised upon a duty to warn the "sovereign qua sovereign." Accordingly, we find no error.

VII. Market Share Liability

Exxon argues that market share liability is not an acceptable theory of recovery and, that, even if it is, the trial court erred in applying market share liability in this case. Several years before trial, Exxon sought an order requiring the State to specify "which Defendants it seeks to hold liable for the damages," "what damages it seeks to recover from those Defendants and when and how the damages occurred," and "the legal theory for holding those Defendants liable for the damages." (Quotations omitted.) The trial court denied the motion, finding that

requiring the State to allege specifically which defendant caused each injury would create an impossible burden given the allegations of commingling of MTBE and the asserted indivisible injury to the State of New Hampshire's water supplies. To mandate the State to establish more particularized causation would essentially allow the defendants to seek to avoid liability because of lack of individualized proofs where the gravamen of the claim is . . . that all defendants placed gasoline containing MTBE into the stream of commerce, thereby causing [the State's] injury.

To allow such a state of events would be to allow claims for tortious conduct for discrete, identifiable, and perhaps lesser

23

tortious acts, but to deny claims for tortious conduct where the conduct alleged may be part of group activity which is alleged [to] have led to a common, and more deleterious, result.

(Quotation omitted.)

In a subsequent order, the trial court, recognizing that "situations exist where a plaintiff may not necessarily be able to identify, specifically, which members of a group, who are engaged in the same activity, caused his or her damages," noted that courts "allow plaintiffs to prove causation through alternative theories of liability," including market share liability and "seemingly specific to the MTBE cases, . . . commingled product theory." The court found that the "commingled product theory" does not apply here because that theory "only relieves the Plaintiff of its burden to prove the percentage of a particular Defendant's gasoline found at a particular site," and the court "has already found that a specific site-by-site approach is unfeasible and unnecessary in this case." Accordingly, the trial court concluded that market share liability "is a more reasoned approach to this case."

As the trial court explained, the purpose behind market share liability is that

[i]n our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs. In an era of mass production and complex marketing methods the traditional standard of negligence is insufficient to govern the obligations of manufacturer to consumer, courts should acknowledge that some adaptation of the rules of causation and liability may be appropriate in these recurring circumstances.

(Quotation, ellipsis, and brackets omitted.) The court noted that in determining whether market share liability applies in certain circumstances, the Restatement (Third) of Torts: Products Liability sets forth six factors that provide a general framework for analysis:

(1) The generic nature of the product; (2) the long latency period of the harm; (3) the inability of plaintiffs to discover which defendant's product caused plaintiff's harm; (4) the clarity of the causal connection between the defective product and the harm suffered by plaintiffs; (5) the absence of other medical or environmental factors that could have caused or materially contributed to the harm; and (6) the availability of sufficient

"market share" data to support a reasonable apportionment of liability.

(Quotation and ellipsis omitted.)  See Restatement (Third) of Torts: Products Liability § 15 comment c at 233 (1998).  The court found that in this case "these factors weigh heavily in favor of utilizing market share liability."

Exxon subsequently moved for summary judgment on the issue of causation, asserting that New Hampshire has not adopted the market share liability theory, and that "the theory is contrary to New Hampshire law."  The trial court concluded, however, that New Hampshire recognizes market share liability.  Citing Buttrick v. Lessard, 110 N.H. 36 (1969), and Trull v. Volkswagen of America, 145 N.H. 259 (2000), the court reasoned that "[t]he New Hampshire Supreme Court has repeatedly expressed its willingness to provide plaintiffs with a less stringent burden of proof where they face a 'practically impossible burden,'" and that "[g]iven this willingness, the court is confident that existing New Hampshire law supports the application of Market-Share Liability."  Dismissing as unfounded Exxon's suggestion that market share liability "is synonymous with absolute liability," the trial court explained that

[e]ven where a plaintiff proceeds under a Market-Share Liability theory, he must prove that the defendants breached a duty to avoid an unreasonable risk of harm from their products . . . .  The requirement to prove that a defendant breached his duty to avoid harm is a separate and distinct burden.  Only after a plaintiff makes such a showing is he entitled to a relaxed standard for proving causation.

(Quotation and citation omitted.)

Applying the six Restatement factors, the trial court determined that market share liability should be applied in this case.  As to the first factor, the generic nature of the product, the court found that the State had alleged sufficient facts for the court to conclude that MTBE is fungible, i.e., that it is interchangeable with other brands of the same product.  As to the second factor, whether the harm caused by the product has a long latency period, the trial court found that the harm caused by MTBE was not latent because it travels faster and further than other chemicals.  Thus, the court concluded that this factor weighs in favor of Exxon.  As to the third factor, the plaintiff's inability to identify which defendant caused the harm, the trial court concluded this factor weighs in the State's favor because "retailers commingled gasoline in storage tanks at stations, so it would be impossible to determine which of the defendant[s'] MTBE gasoline was discharged into the environment."

25

The trial court found that the fourth factor, the clarity of the causal connection between the defective product and harm suffered by the State, favors the State. The court agreed with Exxon's general proposition that the gasoline market does not alone reflect the risk created and, thus, the court required the State "to introduce market share data as targeted as possible (e.g. market share data specific to RFG and non-RFG counties)." (Quotation omitted.) Noting that it is impossible to determine market share with mathematical exactitude, the court concluded that the experts' market data was sufficient.

The trial court found the fifth and sixth factors favor the State. As to the fifth factor, whether other medical or environmental factors could have contributed to the harm, the court noted that Exxon had not asserted that other factors contributed. As to the sixth factor, the sufficiency of the market data, the court found that the State's experts had presented "enough market data to allow the State to proceed" on a market share liability theory.

Following the jury verdict, Exxon moved for JNOV, arguing, in part, that, for five reasons, the market share liability evidence the jury considered was insufficient for the jury to find it liable: (1) there was no evidence that Exxon's market share for MTBE gasoline was 28.94% because that figure measured all gasoline supplied in New Hampshire; (2) there was no evidence to support the jury's finding that all gasoline containing MTBE was fungible; (3) no rational trier of fact could have found that the State could not trace MTBE gasoline back to the company that supplied it because, from 1996 to 2005, the State could identify the suppliers that caused its alleged harm; (4) the State failed to identify a substantial segment of the relevant market for gasoline containing MTBE because it only presented evidence as to "a snapshot of" the wholesale market; and (5) the State failed to establish the relevant market at the time of its alleged injuries. Noting that Exxon had raised, and the court had rejected, all of these arguments before, and because Exxon raised no new law or facts to support its motion, the court addressed Exxon's arguments "only for the purpose of further explanation and clarification."

Considering Exxon's first and fifth arguments together, the court determined that "the State presented sufficient evidence for a reasonable juror to conclude that all gasoline imported into New Hampshire was commingled with MTBE gasoline. From there, the jury could reasonably have assigned Exxon the share of the gasoline market that its supply represented." With respect to Exxon's second argument, the court concluded that there was "sufficient evidence from which a reasonable jury could find that MTBE gasoline was fungible." As to Exxon's third and fourth arguments, the court noted that the State "presented evidence through various witnesses from which a juror could reasonably conclude that all gasoline in New Hampshire was statistically likely to be commingled with MTBE to some concentration. Thus, it was for the jury to decide whether it would rely upon the 100 percent figure

[the State's expert] provided, or a lower figure." The court also observed that it had previously found the State's expert qualified, and that her testimony "was based upon sufficient facts and data; her testimony was the product of reliable principles and methods; and she applied the principles and methods reliably to the facts of the case." Finally, the trial court addressed Exxon's additional argument that, because MTBE gasoline could be traced to a supplier from the refinery, the State failed to prove its market share case. The court stated:

> The State's theory of the case, as addressed in pretrial, trial, and directed verdict rulings, was that MTBE gasoline is untraceable once spilled or leaked; once it causes harm to the State. It is wholly irrelevant that gasoline might be traceable to a particular supplier from a wholesale distributor or even the refinery because, as the State alleged, once the gasoline causes harm, it cannot be traced to a supplier, distributor, or refiner. The jury heard evidence to this extent, and could thereby have found that the State met the requisites of relying on market share liability for causation purposes.

Exxon also moved to set aside the verdict and for a new trial arguing, in part, that the trial court erred as a matter of law by allowing the State to use market share liability. Exxon argued that the State "should have been compelled . . . to proceed on a site-specific basis and rely on traditional causation to prove its claims," and that it was error "to permit the State to use a wholesale supplier market share when it was undisputed that . . . the MTBE gasoline that allegedly caused the State's harm could be traced back to the wholesale suppliers, thus negating the need for or applicability of [market share liability] theories." The trial court rejected Exxon's arguments. As to Exxon's argument that the jury needed to find first that the State could not prove traditional causation in order to find the State entitled to rely upon market share liability, the trial court stated that market share liability "did not require the State to prove that it could not establish traditional causation; it required the State to show that it could not identify the tortfeasor responsible for its injury. The 'last resort' requirement focuses on the inability of the plaintiff to identify the manufacturer of a product, not the absence of alternative causes of action or theories of recovery." The court concluded:

> During trial, the State presented several witnesses who testified that MTBE gasoline is fungible and commingled at nearly every step in the distribution network, thereby making it virtually impossible if not impossible to trace from a spill or leak back from a contamination site to a retailer or supplier. This testimony tended to fulfill the State's burden of proving that it was unable to identify the specific tortfeasor responsible for its injury. The jury's verdict—finding that the State was unable to identify the specific

27

tortfeasor responsible for its injury—was not conclusively against the weight of the evidence.

(Citations omitted.)

On appeal, Exxon argues that the trial court erred in adopting market share liability in New Hampshire because it "departs from centuries of New Hampshire law." Exxon also argues that "[e]ven if market share liability would ever be appropriate under New Hampshire law, this would be a poor case to make that first jump" and that the trial court "applied the wrong market share." The State argues that traditional principles of tort law support the use of market share evidence, that Exxon has failed to show that market share liability was not warranted on the facts of this case, and that the trial court properly ruled that the jury was entitled to determine that Exxon should be held liable for its percentage of the supply, rather than the refining, market.

We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case. In the Matter of McArdle & McArdle, 162 N.H. 482, 485 (2011). We review questions of law de novo. Sanderson v. Town of Candia, 146 N.H. 598, 600 (2001).

Market share liability has its roots in a 1980 decision of the California Supreme Court, Sindell v. Abbott Laboratories, 607 P.2d 924 (Cal. 1980). In Sindell, the plaintiffs alleged injuries resulting from their in utero exposure to the drug diethylstilbesterol (DES), a synthetic hormone that was marketed to women as a miscarriage preventative from 1947 to 1971. Sindell, 607 P.2d at 925. In 1971, a link was discovered between fetal exposure to DES and the development many years later of adenocarcinoma. Id. Over 200 manufacturers made DES and, because of the long latency period and generic nature of the drug, many plaintiffs were unable to identify the precise manufacturer of the DES ingested by their mothers during pregnancy. Id. at 931. Plaintiff Sindell brought a class action against 11 drug manufacturers, alleging that the defendants were jointly and severally liable because they had acted in concert to make, market, and promote DES as a safe and effective drug for preventing miscarriages. Id. at 925-26. The trial court had dismissed the claims due to Sindell's inability to identify which defendants had manufactured the DES responsible for her injuries. Id. at 926.

In reversing that decision, the California Supreme Court expanded alternative liability to encompass what is now known as market share liability. Under market share liability, the burden of identification shifts to the defendants if the plaintiff establishes a prima facie case on every element of the claim except for identification of the actual tortfeasors, and the plaintiff has joined the manufacturers of a "substantial share" of the DES market. Id. at 936-37. Once these elements are established, each defendant is severally

liable for the portion of the judgment that represents its share of the market at the time of the injury, unless it proves that it could not have made the DES that caused the plaintiff's injuries.  Id. at 937.

The court based its decision upon two considerations:  (1) "as between an innocent plaintiff and negligent defendants, the latter should bear the cost of the injury"; and (2) "[f]rom a broader policy standpoint," because the manufacturer "is in the best position to discover and guard against defects in its products and to warn of harmful effects . . . , holding it liable . . . will provide an incentive to product safety."  Id. at 936.  The court held it to be reasonable, in the context of the case, "to measure the likelihood that any of the defendants supplied the product which allegedly injured plaintiff by the percentage which the DES sold by each of them . . . bears to the entire production of the drug sold by all for that purpose."  Id. at 937.  By holding each defendant liable for the proportion of the judgment represented by its share of the market, "each manufacturer's liability would approximate its responsibility for the injuries caused by its own products."  Id.

Several states have adopted some form of market share liability.  See, e.g., Collins v. Eli Lilly Co., 342 N.W.2d 37, 49-51 (Wis. 1984) (adopting a form of market share liability in DES case); Martin v. Abbott Laboratories, 689 P.2d 368, 380-82 (Wash. 1984) (rejecting Sindell market-share theory of liability in favor of market-share alternative liability in DES case); Hymowitz v. Eli Lilly and Co., 539 N.E.2d 1069, 1075-78 (N.Y. 1989) (adopting market share liability theory for a national market in DES case); Conley v. Boyle Drug Co., 570 So. 2d 275, 285-86 (Fla. 1990) (adopting market share alternate liability theory in DES case); Smith v. Cutter Biological, Inc., 823 P.2d 717, 727-29 (Haw. 1991) (adopting market share liability theory in action against manufacturers of blood product).  In other jurisdictions, courts have left open the possibility of adopting market share liability in the future.  See, e.g., Skipworth v. Lead Industries Ass'n, Inc., 690 A.2d 169, 172 (Pa. 1997) (deciding not to adopt market share liability in lead paint case, but recognizing that the need to adopt that theory might arise in the future); Shackil v. Lederle Laboratories, 561 A.2d 511, 529 (N.J. 1989) (decision "should not be read as forecasting an inhospitable response to the theory of market-share liability in an appropriate context"); Case v. Fibreboard Corp., 743 P.2d 1062, 1066-67 (Okla. 1987) (rejecting market share liability in asbestos case but recognizing that market share considerations were sufficient in DES context to achieve a balance between the rights of the defendants and the rights of the plaintiffs); Payton v. Abbott Labs, 437 N.E.2d 171, 190 (Mass. 1982) (court might recognize "some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the market in the relevant period of time"); see Abel v. Eli Lilly and Co., 343 N.W.2d 164, 173-74 (Mich. 1984) (a "new DES-unique version of alternative liability" will be applied in cases in which all defendants

have acted tortiously, but only one unidentifiable defendant caused plaintiff's injury).

We disagree with Exxon that the trial court erred in concluding that New Hampshire would recognize market share liability as an alternative liability theory and that the theory is proper on the facts of this case. In <u>Buttrick v. Lessard</u> we adopted strict liability for design defect claims because requiring the plaintiff to prove negligence would impose "an impossible burden" on the plaintiff due to the difficulty of proving breach of a duty by a distant manufacturer using mass production techniques. <u>Buttrick</u>, 110 N.H. at 39. We explained:

> The rule requiring a person injured by a defective product to prove the manufacturer or seller negligent was evolved when products were simple and the manufacturer and seller generally the same person. Knowledge of the then purchaser . . . was sufficient to enable him to not only locate the defect but to determine whether negligence caused the defect and if so whose. The purchaser of the present day is not in this position. How the defect in manufacture occurred is generally beyond the knowledge of either the injured person or the marketer or manufacturer.

<u>Id</u>. As we later noted, what was crucial to our policy analysis in <u>Buttrick</u> "was the recognition that the need to establish traditional legal fault in certain products liability cases had proven to be, and would continue to be, a practically impossible burden. This was the compelling reason of policy without which <u>Buttrick</u> would have gone the other way." <u>Bagley v. Controlled Environment Corp.</u>, 127 N.H. 556, 560 (1986) (citations and quotation omitted).

Based upon this rationale, we subsequently placed the burden of proving apportionment upon defendants in crashworthiness or enhanced injury cases involving indivisible injuries. <u>Trull</u>, 145 N.H. at 260. In <u>Trull</u>, we held that plaintiffs were required to prove that a design defect was a substantial factor in producing damages over and above those caused by the original impact to their car, and, once they had made that showing, the burden would shift to the defendants to show which injuries were attributable to the initial collision and which to the design defect. <u>Id</u>. at 265. That burden was placed upon the defendants because the plaintiffs would otherwise have been "relegated to an almost hopeless state of never being able to succeed against a defective designer." <u>Id</u>. (quotation omitted). We were persuaded by policy reasons not to place a "practically impossible burden" upon injured plaintiffs. <u>Id</u>.

By contrast, we have declined to expand products liability law in cases in which plaintiffs have not faced a practically impossible burden of proving negligence. <u>See, e.g.</u>, <u>Royer v. Catholic Med. Ctr.</u>, 144 N.H. 330, 335 (1999)

(strict liability did not apply to tort action against non-manufacturer hospital for selling defective prosthetic knee to plaintiff); Bruzga v. PMR Architects, 141 N.H. 756, 761 (1997) (unlike a consumer who purchases a mass-produced good, strict liability does not apply to architect and contractor because the owner or user of a building does not face "extraordinary difficulties in proving liability under traditional negligence principles"); Bagley, 127 N.H. at 560 (declining to impose strict liability in action by landowner against adjoining landowner for damages resulting from soil and groundwater contamination because "there [was] no apparent impossibility of proving negligence"); Siciliano v. Capitol City Shows, Inc., 124 N.H. 719, 730 (1984) (refusing to extend strict liability to owner and operator of amusement park ride when there was no indication that the plaintiffs suffered an "unfair burden" from not doing so because they possess adequate protection through an action for negligence); Wood v. Public Serv. Co., 114 N.H. 182, 189 (1974) (no "compelling reason of policy or logic" advanced to apply strict liability to electric companies in wrongful death action).

We have also declined to expand products liability law when the defendants could not have been at fault. Simoneau v. South Bend Lathe, Inc., 130 N.H. 466 (1988). In Simoneau, we rejected the product line theory of successor liability, reasoning that "liability without negligence is not liability without fault." Id. at 469. Under the product line theory, a party that acquires a manufacturing business and continues the output of its line of products, assumes strict liability for defects in units of the same product line manufactured and sold by the predecessor company. Id. at 468. We refused to "impose what amounts to absolute liability on a manufacturer," id. at 470, reaffirming "[t]he common-law principle that fault and responsibility are elements of our legal system applicable to corporations and individuals alike" and that such principle ought "not be undermined or abolished by spreading of risk and cost in this State." Id. at 469 (quotation omitted).

Based upon the reasoning expressed in our cases developing products liability law in New Hampshire, the trial court concluded that it would "not rigidly apply theories of tort law where doing so would either be impractical or unfairly 'tilt the scales' in favor of one party or another." We agree with the trial court that, based upon our willingness to construct judicial remedies for plaintiffs who would be left without recourse due to impossible burdens of proof, applying market share liability was justified in the circumstances presented by this case. In addition to finding that the State had proven all of the elements of its claims, the jury found: "MTBE gasoline is fungible"; the State "cannot trace MTBE gasoline found in groundwater and in drinking water back to the company that manufactured or supplied that MTBE gasoline"; and the State "has identified a substantial segment of the relevant market for gasoline containing MTBE." We have reviewed the record and conclude that it contains sufficient evidence to support the jury's findings. Given the evidence presented, the State faced an impossible burden of proving which of several

31

MTBE gasoline producers caused New Hampshire's groundwater contamination. We hold that the trial court did not unsustainably exercise its discretion in allowing the State to use the theory of market share liability to determine the portion of the State's damages caused by Exxon's conduct.

Exxon argues that because the trial court found that there was sufficient evidence for the State to prove traditional causation, it erred by instructing the jury on market share liability. We disagree. To the contrary, the trial court merely found that the State could prove "but for" causation as required under the market share liability theory. "Under market share liability, the burden of identification shifts to the defendants if the plaintiff establishes a prima facie case on every element of the claim except for identification of the actual tortfeasor or tortfeasors . . . ." In re Methyl Tertiary Butyl Ether Products Liab., 379 F. Supp. 2d 348, 375 (S.D.N.Y. 2005). Exxon argued in its motion for a directed verdict at the close of the State's case-in-chief that, "[f]or each of the State's claims, the State was required to provide evidence specific to ExxonMobil that gasoline containing MTBE from ExxonMobil was the but for cause of the State's alleged injuries and that ExxonMobil's conduct or product were a substantial factor in bringing about the State's alleged injuries." Exxon asserted that such proof "was utterly lacking . . . and the State has not identified any evidence that gasoline containing MTBE from ExxonMobil caused any of the alleged contamination in this case under traditional theories of causation."

The trial court denied Exxon's motion, reasoning that, from testimony presented by the State, "a reasonable jury could conclude that Exxon was the proximate cause of the State's alleged injury under a traditional causation theory." Thus, the trial court rejected Exxon's argument that the State had not established a prima facie case on each of its claims. Further, the evidence established that MTBE gasoline is a fungible product, that the fungibility of MTBE gasoline allows it to be commingled at nearly every step of the gasoline distribution system, and that commingling prevents the State from tracing a molecule of MTBE gasoline from the refinery to New Hampshire so that the State cannot identify the refiner of the MTBE gasoline that caused the harm. Thus, because the State could not identify the tortfeasor responsible for its injury, under market share liability the burden of identification shifted to Exxon. Accordingly, the jury was instructed:

> If the State has been harmed by a product that was manufactured and sold by any number of manufacturers and suppliers, and the State has no reasonable means to prove which manufacturer or supplier supplied the product that caused the injury, then the State may use market share liability to satisfy its burden of proof. Under market share liability, ExxonMobil is responsible for the State's harm in proportion to ExxonMobil's

32

share of the market for the defective product during the time that the State's harm occurred.

> Market share liability requires that the State . . . prove all the elements for negligence, or strict liability defect in design, or strict liability based on a failure to warn and that the State suffered harm. In addition, the State must prove the following: (1) it has identified enough MTBE gasoline manufacturers or suppliers in this case so that a substantial share of the relevant market is accounted for; and (2) MTBE gasoline is fungible, meaning that one manufacturer's or supplier's MTBE gasoline is interchangeable with another's; and (3) the State cannot identify the manufacturer or supplier of the MTBE gasoline that caused the harm.

Finally, we find no error with the trial court's ruling that the jury was entitled to determine that Exxon could be held liable for its percentage of the supply market. As the trial court reasoned, because Exxon "had or should have had knowledge of the characteristics of MTBE gasoline from [its] refining role[ ]," a jury could find Exxon liable for MTBE gasoline it supplied but did not refine. The trial court explained that the jury was entitled to estimates of supplier and refiner market share and that both reflected Exxon's "creation of the risk within the State," and that "[a]ny figure within this spectrum would be an appropriate measure of the State's damages."

## VIII. Aggregate Statistical Evidence

Exxon argues that the State should not have been permitted to rely upon aggregate statistical evidence rather than individualized evidence of particular water supplies and sites. Before trial, Exxon moved to exclude the opinions of three of the State's experts estimating the probability of MTBE occurrence in New Hampshire, the past costs of MTBE remediation, and the future costs of investigating and remediating MTBE sites. Exxon argued that these experts, Dr. Graham Fogg, Gary Beckett, and Dr. Ian Hutchison, "attempt to draw statewide conclusions about MTBE detections and costs from small 'sample' datasets, extrapolating to the State at large," but "fail . . . to follow basic, well-accepted statistical and scientific principles."

Following a hearing, the trial court issued a written order "accept[ing] the [State's] argument that using statistical methods is appropriate and, as a result, the state-wide proof model is acceptable and relevant." The court reasoned that "the use of statistical methods, assuming their reliability, makes the existence of the [State's] injury more probable than it would be without such evidence; likewise, it will assist the trier of fact to understand and determine both the existence and extent of the [State's] injury." Thus, the trial court concluded that the State's experts' opinions "are relevant to prove injury-

in-fact and damages" and that it would accept proof of injury "through the use of statistical evidence and extrapolation, i.e. the 'state-wide approach.'"

The trial court set forth several reasons in support of its conclusion. First, the court noted that the majority of the cases cited by Exxon are class-action cases, "which disallow the use of aggregate damages across a class of plaintiffs." The court found those cases distinguishable because, here, the State "does not seek to establish injury among several class plaintiffs through the use of an aggregate model, but instead seeks to prove its own injury through the use of statistics." Second, the court reasoned that New Hampshire's "'declaration of policy' confirms that an injury to both public and private waters within the [s]tate is an indivisible injury, allowing for the State to prove its claim upon state-wide proof." The court stated that under RSA 481:1, "[t]he state as trustee of the waters for the public benefit declares that it has the authority and responsibility to provide careful stewardship over all the waters lying within its boundaries," and that this statute provides the State "with more than just a vehicle to demonstrate standing: the statute allows the [State] to prove injury to a single resource." (Quotation and brackets omitted.) Finally, the trial court reasoned that "general policy considerations support allowing the [State] to establish injury and damages using statistical methods." The court stated:

> American manufacturers now mass produce goods for consumption by millions using new chemical compounds and processes, creating the potential for mass injury. As a result, modern adjudicatory tools must be adopted to allow the fair, efficient, effective and responsive resolution of claims of these injured masses. In a perfect setting, the [State] would have the resources to test each individual well over a long period of time and precisely determine its damages. However, if such a process were undertaken here, it would have to continue beyond all lives in being. The Court simply cannot support such a process.

> Moreover, requiring the [State] to test each individual well undoubtedly and unfairly "tilts the scales" in [Exxon's] favor . . . . Here, . . . the necessary additional litigation costs the [State] would have to bear would consume much of any recovery, making continued pursuit of the litigation fruitless. Because of these public policy interests, the Court finds that allowing the [State] to use statistical methods of proof is relevant to prove injury and damages in this case.

> The fact is that for decades, judges, lawyers, jurors, and litigants have shown themselves competent to sift through statistical evidence in a variety of contexts, from mass toxic torts to single-car collisions. Not only have they shown themselves

competent, but also such evidence has become a generally
accepted method for a plaintiff to prove his case. This Court is
simply not persuaded by [Exxon's] attempt to frame this case as a
class action. As a result, the Court rejects the notion that New
Hampshire law forbids the use of a statistical approach to prove
injury-in-fact.

(Quotations, citations, brackets, and ellipsis omitted.)

Exxon subsequently attempted to exclude the opinions of the same three
experts on grounds of reliability, arguing that the State's experts used improper
methodologies and, even when they used proper methodologies, they applied
the methodologies incorrectly to the facts and data provided. After conducting
a thorough analysis of each of the statistical methods employed by the State's
experts, the trial court concluded that their opinions and methodologies were
reliable and denied Exxon's motion.

Following the trial court's ruling that the statewide approach was
acceptable, Exxon sought an interlocutory transfer to this court. The trial
court denied the request, finding that Exxon failed to satisfy the requirements
of New Hampshire Supreme Court Rule 8(1). See Sup. Ct. R. 8 (interlocutory
appeal from ruling). In its order, the trial court noted that, despite its rulings
otherwise, Exxon continued to assert that it is feasible to try this case on a
well-by-well approach. As the court explained, under Exxon's approach,

the State would identify a contaminated drinking-water well and
then trace the source of contamination to a particular physical
location that leached gasoline into the ground. These locations will
usually be businesses associated with gasoline, like retail gas
stations and junkyards. From here, these entities can then trace
the gasoline back through the product chain to the wholesaler and
eventually the refiner. In this way, either the State or the retailers
can spread the liability throughout the product chain. [Exxon]
explain[s] that because all entities in a product chain would be
liable for the State's harm, the State should be required to proceed
on a well-by-well approach.

The trial court found this method to be "technically and scientifically
infeasible." The court reasoned:

The State's case attempts to impose liability on
manufacturers and refiners. Without decision makers selecting,
marketing, and reformulating MTBE, it would never have been
included in the RFG program and would never have been imported
into New Hampshire to spill, leak, and evaporate. Gasoline
imported into New Hampshire would not have been capable of

35

contaminating the State's water resources in the vast, seemingly uncontainable way it has if it did not contain MTBE. The State has chosen to pursue the named Defendants because they created the initial risk that led to widespread contamination. Based on this selected class of defendants, product tracing is virtually impossible.

Defendants themselves admit that tracing MTBE found in a contaminated well all the way back to the refiner is virtually impossible because MTBE lacks a chemical signature, linking it to a particular refiner. Additionally, a contaminated well, many times, cannot be traced to a particular retailer, making it practically impossible to trace MTBE to a specific wholesaler.

Following the jury verdict, Exxon argued in its motion to set aside the verdict that the statewide approach allowed the State "to prove its private well and 'future injury' case using statistical extrapolations from experts about potential hypothetical impacts rather than particularized evidence of an actual injury" and that this "resulted in the State being able to avoid its burden to prove individualized causation with respect to particular private well impacts." The trial court denied the motion, stating that its prior rulings on this issue were rulings of law and that because "Exxon does not raise any new facts regarding these rulings and it does not contend that the jury's verdict was conclusively against the weight of the evidence," the argument "did not properly fall within the purview" of a motion to set aside.

On appeal, Exxon argues that the trial court erred in allowing the State to prove its case on a statewide basis. Exxon asserts that "[e]very other court to address the issue has recognized that MTBE tort cases depend overwhelmingly on individualized questions of law and fact, and thus are not amenable to proof on a mass basis." According to Exxon, the trial court "broke from these precedents" in allowing statewide aggregate evidence. The State argues that the "immense scope of Exxon's pollution" has "directly affected a substantial portion of the State's population" and that "[t]he statewide nature of Exxon's tortious conduct, therefore, required adjudication on a statewide basis." (Quotation omitted.) The State asserts that Exxon has "mischaracterize[d] both the trial record and the relevant standards of review."

We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case. In the Matter of McArdle, 162 N.H. at 485.

Exxon cites In re Methyl Tertiary Butyl Ether Products Litigation, 209 F.R.D. 323 (S.D.N.Y. 2002), as an example of why "MTBE tort cases depend overwhelmingly on individualized questions of law and fact." The trial court,

however, found this and other MTBE cases involving a determination as to "injury in fact" to be unhelpful, as "the facts of this case are very different." In contrast to the New York MTBE case in which the court dismissed full categories of class plaintiffs who had actually tested and detected no MTBE in their wells, the trial court noted that here, "the [State] has tested many wells where it has discovered the existence of MTBE. It merely seeks to extrapolate that information in order to establish further injury." The trial court agreed that "if the [State] had not tested any wells or had tested wells and found no MTBE, the [State's] pursuit of a statistical approach would be fruitless." As further distinguishing the New York MTBE case, the trial court noted that, whereas in the New York case, the plaintiffs' allegations neither contained any statistics pertaining to MTBE detection rates for private wells nor established that the private wells were located in proximity to possible release sites, here the State "provided the Court with adequate statistical evidence through their experts," and, the State seeks recovery "on the basis of 'high-risk' areas only."

At trial, the State offered proof based upon expert testimony regarding 1,584 specific sites where MTBE has been known to leak and has contaminated the subsurface. The State also introduced scientific evidence through expert testimony that 5,590 drinking water wells serving 16,276 people are contaminated with MTBE at levels over 13 ppb, and that many more are expected to become contaminated in the future. Dr. Fogg used substantial data on MTBE contamination in the state to calculate statistically the number of drinking wells currently contaminated by MTBE. The State's experts expressly accounted for the fact that "every site is different." Exxon does not contend on appeal that the expert evidence was irrelevant or unreliable.

Based upon the record, we conclude that the trial court's determination that the use of statistical evidence and extrapolation to prove injury-in-fact was not an unsustainable exercise of discretion. See Bodwell v. Brooks, 141 N.H. 508, 510-11 (1996) (statistical probability evidence may be used to rebut the presumption of legitimacy); Rancourt v. Town of Barnstead, 129 N.H. 45, 50-51 (1986) (validity of a town's growth control ordinance rests upon a relationship between the town's growth restrictions and a projection of "normal growth" based upon scientific and statistical evidence); In re Neurontin Marketing and Sales Practices, 712 F.3d 21, 42 (1st Cir. 2013) ("courts have long permitted parties to use statistical data to establish causal relationships").

IX. RSA 507:7-e and DeBenedetto

Exxon argues that it was "unfairly prejudiced in its ability to present its defense" under RSA 507:7-e (2010) and DeBenedetto v. CLD Consulting Engineers, Inc., 153 N.H. 793 (2006). Before trial, Exxon filed disclosures containing lists of several thousand non-litigants, including the names of gasoline suppliers, gasoline importers, foreign refiners, domestic refiners, distributors, trucking companies, and persons with leaking underground

storage tanks.  After reviewing these initial disclosures, the trial court found that they did not sufficiently allege fault against the non-litigants and, as a result, did not provide either the court or the State with adequate notice under DeBenedetto.  The trial court ordered Exxon to "set forth, with specificity, a good faith basis for why each party listed within their disclosures is responsible for the claims made by the State."

The State subsequently moved to strike Exxon's supplemental disclosures, maintaining that Exxon failed to comply with the trial court's order because the disclosures did not provide sufficient evidence specific to each DeBenedetto party.  In its order, the trial court stated:

> Despite the fact that the New Hampshire Supreme Court has never directly addressed the present DeBenedetto issues, it has, nonetheless, supplied a framework to guide this court's analysis. This framework is made up of four principles:  first, that RSA 507:7-e applies to all parties contributing to the occurrence giving rise to the action, including those immune from liability or otherwise not before the court; second, that a civil defendant who seeks to deflect fault by apportionment to non-litigants is raising something in the nature of an affirmative defense; third, the defendant carries the burdens of production and persuasion; and fourth, that a defendant may not easily shift fault under RSA 507:7-e; allegations of a non-litigant tortfeasor's fault must be supported by adequate evidence before a jury or court may consider it for fault apportionment purposes.

(Quotations and citations omitted.)

The trial court found "the most notable portion of the framework, and the most helpful in the present analysis, is that portion identifying non-litigant liability as akin to an 'affirmative defense.'"  Because in New Hampshire defendants are required to plead affirmative defenses to provide the plaintiff with adequate notice of the defense and a fair opportunity to rebut it, the trial court determined that "when a defendant raises a defense under DeBenedetto, its disclosure must provide the plaintiff with adequate notice of the defense and the plaintiff must be given fair opportunity to rebut it."  Looking at the requirements of other jurisdictions, the court reasoned that the Colorado standard "for evaluating a defendant's notice of non-litigant fault [is] persuasive in molding a standard for 'adequate notice' under DeBenedetto." Thus, the court concluded that

> proper notice in the DeBenedetto context requires [Exxon] to provide to the State identifying information for the nonparty in addition to a brief statement of the basis for believing such nonparty to be at fault.  Furthermore, the notice must allege

38

sufficient facts to satisfy all the elements of at least one of the
State's claims.

(Quotations, citations, and brackets omitted.)  The trial court rejected Exxon's
assertion that it need demonstrate only "how a DeBenedetto party contributed
to the harm alleged by the State, not correspond each DeBenedetto party to
individual claims," reasoning that Exxon cannot assert that it has "any less of
a burden than to link [its] own allegations of non-litigant fault to at least one of
the claims asserted by the State."  (Quotation omitted.)

Thereafter, the trial court determined that with respect to negligence,
Exxon "must assert that a nonparty owed a duty with respect to MTBE gasoline
and breached that duty.  This will require demonstrating that a nonparty had
some knowledge of MTBE or its characteristics, or should have had some
knowledge."  With respect to products liability, the trial court determined that
Exxon "must assert that a nonparty knew or reasonably should have known of
the nature of MTBE upon which the State's claims are based in order to show
that an entity below [Exxon] in the product chain is similarly culpable and/or
owed a similar duty to warn."  The trial court explained that Exxon "need not
show that a nonparty was aware of the unique nature of MTBE . . .  However, a
nonparty cannot possibly [have] foreseen the type of harm alleged by the State
absent some knowledge that MTBE was generally present in gasoline or could
have been present.  Alternatively, [Exxon] may demonstrate that a nonparty
should have known of MTBE."

After the jury verdict, Exxon moved to set aside the verdict and for a new
trial.  Exxon argued that the trial court erred by:  (1) "improperly requiring
ExxonMobil to prove that the non-parties were liable for the State's claims,
rather than proving only that they contributed to the State's injury"; (2)
"preventing ExxonMobil from relying on RSA 146-A to establish the non-
parties' fault"; (3) "requiring proof that the non-parties had actual or
constructive knowledge of MTBE's presence in gasoline before contributing to
the State's injury"; and (4) requiring it to present "categories of evidence rather
than evidence about the actions of particular individuals in connection with
particular injuries."

The trial court rejected Exxon's first three challenges because they raised
pure questions of law that the court addressed pretrial and "Exxon has raised
no new fact or law to convince the Court to readdress these arguments."
Regarding the statewide proof claim, the trial court agreed with the State that
allowing categories was a convenience, not a requirement, and "Exxon could
have presented evidence regarding every individual DeBenedetto party, as
opposed to categorical evidence."  As to the categories, the trial court found
that "Exxon presented very little evidence establishing nonparty liability" and
that its primary witness who testified regarding the various categories of
nonparties "did not indicate that nonparties were aware of MTBE's presence in

39

gasoline during the relevant time period, and he never stated that nonparties were aware their actions caused spills and leaks that caused MTBE contamination." Accordingly, the trial court concluded that it "cannot say that a jury verdict rejecting Exxon's DeBenedetto defense was conclusively against the weight of the evidence."

On appeal, Exxon argues that the trial court's DeBenedetto rulings "deviate from clear precedent and denied Exxon a meaningful opportunity to prove that third parties contributed to at least part of the alleged harm." Exxon asserts that the trial court's ruling that Exxon had to link each DeBenedetto party to a claim made by the State "eviscerated Exxon's statutory right to allocate fault to third parties." The State argues that Exxon's DeBenedetto argument is "unavailing because Exxon did not show at trial that non-parties were at fault for MTBE pollution."

We review challenges to a trial court's evidentiary rulings under our unsustainable exercise of discretion standard and reverse only if the rulings are clearly untenable or unreasonable to the prejudice of a party's case. In the Matter of McArdle, 162 N.H. at 485. We review questions of law de novo. Sanderson, 146 N.H. at 600.

Pursuant to RSA 507:7-e and DeBenedetto, defendants may ask a jury to shift or apportion fault from themselves to other nonparties in a case. RSA 507:7-e, I, provides:

> I. In all actions, the court shall:
>
> (a) Instruct the jury to determine . . . the amount of damages to be awarded to each claimant and against each defendant in accordance with the proportionate fault of each of the parties; and
>
> (b) Enter judgment against each party liable on the basis of the rules of joint and several liability, except that if any party shall be less than 50 percent at fault, then that party's liability shall be several and not joint and he shall be liable only for the damages attributable to him.

"[F]or apportionment purposes under RSA 507:7-e, the word 'party' refers not only to 'parties to an action, including settling parties,' but to all parties contributing to the occurrence giving rise to an action, including those immune from liability or otherwise not before the court." DeBenedetto, 153 N.H. at 804 (quotation, ellipsis, and citation omitted). "[A] defendant may not easily shift fault under RSA 507:7-e; allegations of a non-litigant tortfeasor's fault must be supported by adequate evidence before a jury or court may consider it for fault apportionment purposes." Id. "[A] civil defendant who seeks to deflect fault by apportionment to non-litigants is raising something in the nature of an

affirmative defense." Goudreault v. Kleeman, 158 N.H. 236, 256 (2009). Accordingly, "the defendant carries the burdens of production and persuasion." Id. Furthermore, "a defendant who raises a non-litigant apportionment defense essentially becomes another plaintiff who must seek to impose liability on a non-litigant just as a plaintiff seeks to impose it on him." Id. (quotation and brackets omitted); see Wyle v. Lees, 162 N.H. 406, 413 (2011) (trial court implicitly concluded that the defendants failed to prove their allegations of comparative negligence for purposes of apportionment of damages).

As the trial court correctly concluded, apportionment under RSA 507:7-e requires proof of fault. DeBenedetto, 153 N.H. at 800 (apportionment must include all tortfeasors who are causally negligent by either causing or contributing to the occurrence in question). At trial, Exxon's expert witness, Jeffrey A. Klaiber, an environmental consultant, testified for several days, including providing extensive testimony regarding typical spill and leak scenarios for the various categories of alleged faulty nonparties. He acknowledged, however, that he did not interview anyone at any of the sites that Exxon contends are responsible for MTBE contamination, that he did not know whether anyone who owned or operated any of those sites knew that MTBE gasoline behaves differently from other gasolines when released into the environment, and that he did not know if any of the owners or operators of those sites even knew that MTBE was in the gasoline that they were receiving. Nonetheless, the trial court allowed the jury to consider apportioning liability to those nonparties. The trial court instructed the jury:

> In this state, courts and juries may apportion fault to all persons or entities who contributed to causing an injury, even if they are not parties to the lawsuit. What that means in this case is that if you find that the State has proven any of its three claims against ExxonMobil, then ExxonMobil shall have the burden of proving that some or all of its fault should be allocated to the nonparties identified in Defense Exhibit 1047.

The jury answered "No" to each portion of this question on the special verdict form: "Has ExxonMobil proven, by a preponderance of the evidence, that some or all of its fault should be allocated to nonparties in the following categories? . . . a. Tanks With Holes . . . b. Aboveground Releases . . . c. Tanks With Releases . . . d. Junkyards." Based upon the record, we are not persuaded by Exxon's argument that it was denied "a meaningful opportunity" to apportion fault to third parties or that it suffered any prejudice from the trial court's rulings. Accordingly, we find no error.

X. Parens Patriae

Exxon argues that the trial court erroneously decided that the State had parens patriae standing, rather than submitting this question to the jury.

41

Exxon asserts that whether there is an injury to a "substantial segment" of the population is a question of fact for the jury, not a question of law for the judge, and that a rational jury could have found the State's proof insufficient. The State argues that Exxon waived this argument because Exxon failed to raise it before the trial court, including failing to raise it in its motion for summary judgment on parens patriae issues or in its motion for a directed verdict, and failed to argue it in either its motion for JNOV or motion to set aside the verdict.

We have reviewed the record and agree with the State that Exxon has failed to demonstrate that it specifically raised this argument before the trial court. See Dukette, 166 N.H. at 255. Accordingly, because the argument is not preserved for our review, we decline to address it substantively. See N. Country Envtl. Servs., 150 N.H. at 619.

XI. Future Well Impacts

Exxon argues that the State's "future, speculative, and unknown well and site impacts" are not ripe for review. Before trial, Exxon raised this argument in a summary judgment motion. The trial court denied the motion, stating:

> It is well settled in New Hampshire that an injured party may seek recovery for future harm that will arise from a current injury. In order to recover for future damages, a party need only show that there is evidence from which it can be found to be more probable than not that the future damages will occur. Thus, contrary to [Exxon's] argument, New Hampshire has no absolute prohibition on awarding future damages.
>
> The court finds that the State's damages for future and unknown well impacts are fit for . . . judicial determination. Importantly, the injury causing the future harm has already occurred. The injury occurred when MTBE entered State waters. The State's claim for future damages merely seeks to measure the extent of the harm caused, which New Hampshire allows. Furthermore, the court has already determined that the methods undertaken by the State's experts for determining the future harm . . . are relevant and reliable. Therefore, the State's future damages claims are ripe for review under the first prong of the ripeness test.

(Quotation, citations, and brackets omitted.)

Exxon moved for a directed verdict following the State's conclusion of its case-in-chief arguing, in part, that the State failed to present its damages

42

figure with sufficient certainty. Exxon argued that the State failed to prove that it has "sustained a cognizable injury" and that the State's damages evidence was insufficient. The trial court rejected the motion, stating:

> The State need only show an approximation of its harm. As this Court's prior orders on this issue explain, the State does not need to have identified every contaminated well in New Hampshire to show it is injured. Nonetheless, the State presented testimony in its case-in-chief through Gary Beckett, Dr. Ian Hutchison, Dr. Graham Fogg, Steve Guercia, and Brandon Kernen. These witnesses estimated the number of wells that are currently suffering contamination based on statistical sampling, the location of spill sites, and the number and proximity of drinking wells in New Hampshire. The mere fact that the State's damages figure is based on an approximation does not make it speculative or legally insufficient. Further, the evidence presented during the State's case-in-chief regarding the estimated costs of remediation efforts based on estimated contamination is sufficient for a reasonable juror to conclude the State has suffered a cognizable injury.

(Citation omitted.)

Following the jury verdict Exxon moved for JNOV, arguing that "several aspects of the jury's damages award for future well testing and treatment . . . are unsupported by the evidence." Denying the motion, the trial court stated:

> Exxon explains that even if it is liable, the damages figure the jury awarded is speculative because it is based on expert estimations and not supported by evidence; it is not sufficiently definite. The Court considered and rejected this argument in its directed verdict order: "The mere fact that the State's damages figure is based on an approximation does not make it speculative or legally insufficient." Because Exxon raises no new facts or law, the Court will not reconsider its prior ruling. As such, the record is not so clearly in Exxon's favor that the Court can find the jury's verdict is unsustainable.

(Citation omitted.)

In addition, Exxon moved to set aside the verdict and for a new trial, arguing that "[j]ust because MTBE is in groundwater now does not mean that it will injure private wells in the future," and, therefore, "these projected injuries are speculative and were not ripe." The trial court rejected Exxon's argument, stating:

This Court has ruled that the State's injury already occurred; MTBE has already been brought into New Hampshire. Exxon sought a jury instruction on imminent and immediate harm, which the Court denied. Whether the State has been injured is a question for the jury, but prospective damages are proper where there was evidence from which the jury could find it more probable than otherwise that such damage would occur. Because Exxon's motion raises no new issues of law or fact, the Court declines to reconsider its prior rulings.

(Quotation and citations omitted.)

On appeal, Exxon argues that the trial court erred "in allowing the State to claim more than $300 million in damages for the costs of testing private wells for possible MTBE contamination, $150 million to treat whatever contamination is found in the wells in the future, and another $218 million for anticipated generalized costs to characterize . . . and clean up release sites," because these claims are unripe and should be dismissed. Exxon asserts that the State "did not present proof of actual or imminent contamination to particular private wells," and that the State's claims for treatment of future private-well impacts "are even more uncertain, remote, and contingent." According to Exxon, the trial court's ruling "dramatically increased the scope of this suit and took the [court] into territory where no common law court has gone before."

The State argues that its harm "exists today, and recompense for this type of harm is certainly no less recoverable than future medical expenses or damages for loss of income, both of which are regularly awarded in tort actions without raising ripeness concerns." The State also asserts that its testing and future-treatment claims are ripe because the State "presented concrete evidence of damage that already has occurred."

"[R]ipeness relates to the degree to which the defined issues in a case are based on actual facts and are capable of being adjudicated on an adequately developed record." Appeal of City of Concord, 161 N.H. 344, 354 (2011). Although we have not adopted a formal test for ripeness, we have found "persuasive the two-pronged analysis used by other jurisdictions that evaluates the fitness of the issue for judicial determination and the hardship to the parties if the court declines to consider the issue." Appeal of State Employees' Assoc., 142 N.H. 874, 878 (1998).

We find no error in the trial court's rulings on this issue. The State's claims for future testing and treatment are fit for judicial determination as the harm from MTBE has already occurred. Cf. In re Methyl Tertiary Butyl Ether ("MTBE") Prod., 175 F. Supp. 2d 593, 607-11 (S.D.N.Y. 2001) (individual plaintiffs could not show a present threat of imminent harm because either

44

they had not tested their private wells or tests did not detect MTBE in their wells). The record establishes that, as of the time of trial, over 1,000 drinking wells in the state had tested positive for MTBE, and, of those, 358 wells were contaminated at levels over the maximum contaminant level of 13 ppb. The record also establishes that more than 5,000 wells, which have not yet been tested, were likely already contaminated with MTBE above 13 ppb at the time of trial. The record also contains evidence that the damage from MTBE contamination is not limited to drinking wells. According to the State's experts, MTBE has a "residence time" of up to 50 years, during which time it gradually seeps through subsurface zones toward wells, lakes, and wetlands. The State's experts testified that, although leaks from some underground storage tanks might not yet have been detected, those leaks "will continue to pose a hazard to groundwater quality." As the jury was instructed:

> The State is entitled to be fully compensated for the harm resulting from ExxonMobil's legal fault.
>
> . . . .
>
> In determining the amount of damages to allow the State, you may . . . . consider whether it is more probable than otherwise that its damages will continue into the future as a direct, natural and probable consequence of ExxonMobil's legal fault and, if so, award it full, fair, and adequate compensation for those future damages.

Exxon does not present any argument on the hardship prong of the ripeness test, and we therefore consider any argument regarding that prong to be waived. See State v. Roy, 167 N.H. 276, 286 (2015).

XII. Prejudgment Interest

Exxon argues that the trial court should not have awarded prejudgment interest on future costs. Following the jury verdict, the State moved for taxation of costs, including prejudgment interest pursuant to RSA 524:1-b (2007). Exxon moved to preclude the addition of prejudgment interest on the future costs portion of the State's damage award, arguing that such an award would not serve the statute's purpose and "would amount to an illegal punitive award." Exxon asserted that because money has time value, interest is added to damages for past harms to take into account the time during which the plaintiff was deprived of its use, but "[t]hat rationale is inapposite to an award for future costs associated with establishing investigation, testing and treatment programs and with MTBE impacts that have not yet occurred." The State objected, arguing that because the injury has already occurred when MTBE entered New Hampshire's waters, Exxon's "motion fails in its basic premise; there are no future injuries here." The State also argued that even

assuming future injuries were at issue, the statute "does not distinguish between past and future costs or harm."

The trial court rejected Exxon's arguments, noting that, although during trial, "the State categorized its damages as past, current, and future for purposes of breaking the figure into parts for evidentiary presentation, . . . this presentation was not intended to and did not define the State's injury." The court reasoned:

> The State presented substantial evidence that the damage to its waters had already been done, MTBE had already been imported into the State, and this is the presentation of evidence that the jury accepted by its verdict. The mere fact that the State characterized part of its damages figure as that for future testing and remediation does not mean that it did not suffer the loss of use of these monies prior to the jury's verdict in this case. Further, had these monies been available during the last decade when litigation was pending, arguably, the cost to test and remediate would be lesser now.

On appeal, Exxon argues that the trial court erred "by awarding prejudgment interest on the total judgment amount, or $236,372,664, when $195,243,134 of those damages . . . were for the State's claims for investigating, testing, characterizing, and treating alleged MTBE contamination in New Hampshire's private wells and future costs for site investigation and remediation." According to Exxon, "[p]rejudgment interest on those future costs fails to serve the compensatory purpose of RSA 524:1-b and thus should not have been awarded." The State argues that Exxon "makes no effort to square its argument with [the statute's] text," and that "RSA 524:1-b has dual purposes: to accelerate settlement and provide compensation for the loss of use of money damages." (Quotation and emphasis omitted.) The State asserts that "[a]warding prejudgment interest to all of the State's damages satisfies the objective of accelerating settlement, regardless of when the money underlying the damages is spent," and that "because the contamination occurred in the past, ongoing treatment and testing does not, as Exxon claims, represent 'future harms' or damages the State has yet to incur." (Quotation, brackets, and citation omitted.)

"Ordinarily, upon a verdict for damages and upon motion of a party, interest is to be awarded as part of all judgments." State v. Peter Salvucci Inc., 111 N.H. 259, 262 (1971). Pursuant to RSA 524:1-b, in all civil proceedings, other than an action on a debt,

> in which a verdict is rendered or a finding is made for pecuniary damages to any party, whether for personal injuries, for wrongful death, for consequential damages, for damage to property,

46

business or reputation, for any other type of loss for which damages are recognized, there shall be added . . . to the amount of damages interest thereon from the date of the writ or the filing of the petition to the date of judgment.

RSA 524:1-b; see RSA 524:1-a (2007).

The interpretation of a statute is a question of law, which we review de novo. In the Matter of Liquidation of Home Ins. Co., 166 N.H. 84, 88 (2014). We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. Id. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. Id. Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. Id.

The purpose of the legislature in enacting RSA 524:1-b was "to clarify and simplify the existing law and to make plain that in all cases where the trial court awarded money to the party entitled to be compensated, interest at the legal rate is to be added to the award." Id. at 89 (quotation omitted). Even assuming, without deciding, that the damages award included some amount for "future" costs, the plain language of the statute does not distinguish between past and future damages. Rather, the statute mandates the award of prejudgment interest "to the amount of damages." Thus, the plain language of the statute provides no support for Exxon's argument differentiating past and future damages for purposes of calculating and awarding prejudgment interest. See Starr v. Governor, 151 N.H. 608, 610 (2004) (we will not add words to a statute that the legislature did not see fit to include). Accordingly, we hold that the trial court did not err in awarding prejudgment interest as to all of the State's damages.

XIII. State's Cross-Appeal

The State cross-appeals from the trial court's order imposing a trust upon approximately $195 million of the damages award. Before trial, Exxon moved "to establish a court supervised trust fund for any monies the State recovers in this litigation" and for "an accounting for all settlement proceeds the State has received to date." Exxon argued that the need for a trust fund was necessary "given the speculative nature of the State's future damages," and that a "'pay-as-you-go' fund . . . would effectively limit the State's recovery to those future testing, monitoring, treatment, and remediation costs the State actually incurs." The State objected, and the trial court deferred ruling until after trial.

Following the verdict, Exxon renewed its motion, asserting that "[t]he need for a court-supervised trust is proven by the recent press coverage

47

indicating that the New Hampshire Legislature intends to divert funds awarded in this litigation away from MTBE remediation," and that, in two recent Maryland cases, the court had required court-supervised trust funds in medical monitoring cases involving alleged MTBE exposures. The State objected, arguing, among other contentions, that, because the trial court had already determined that "the underlying causes of action do not require the State to prove how it will spend damages, there is no basis for imposing a court-supervised trust requiring the State to establish how the money will be spent as a prerequisite to obtaining the damages for which Exxon was found liable." In addition, the State argued that Exxon "has not cited a single case, statute, or other authority that would allow [the trial court] to establish a trust fund for monies received by the State pursuant to a jury award in a products liability case," and that Exxon's reliance upon the Maryland cases was misplaced.

The trial court granted Exxon's motion in part, agreeing that "a trust is necessary to protect the res of the jury damage award." The trial court reasoned that "because the State brought this case in its parens patriae/trustee capacity," the "State's obligation to remediate contaminated water exists independent of Exxon's interest in the damages figure the jury awarded the State," and the State "must ensure it has adequate resources to test and treat New Hampshire's waters in the future." The court declined to impose a trust upon the amount of damages designated for past cleanup costs, reasoning that "those monies must be available upon final judgment" for the State to reimburse itself. However, the court imposed a trust upon the amount of damages designated for 228 high-risk sites, sampling private drinking water wells, and treating drinking water wells contaminated with MTBE at or above the maximum contaminant level. The court rejected Exxon's request for an order compelling the State to disclose how it would proceed with testing and remediation, but noted that "to the extent Exxon has a legal interest in a trust as a beneficiary at the termination of the trust, it may file a proposed procedure for how the trust should function." The trial court deferred deciding whether the trust would be court-supervised, and a hearing date was set for the court "to consider each party's proposal for the administrative details of a trust."

Before the scheduled hearing date, the State moved for reconsideration of the trial court's order, Exxon filed this appeal, and the State filed its cross-appeal. We subsequently issued an order staying the appellate proceedings to allow the trial court to issue a final decision on the State's motion for reconsideration. The trial court thereafter denied the motion. The court noted at the outset that "it would be inefficient for the Court to decide all the relevant details of a trust now, if the Supreme Court is being asked to decide whether the existence of a trust is permissible. As such, this Court interprets the Supreme Court order to require a ruling on imposition of a trust but not the details." The trial court rejected the State's arguments that, among other

things, the court conflated parens patriae and the public trust doctrine, failed to comply with RSA 6:11, III (Supp. 2014), and violated separation of powers. The trial court also rejected the State's argument that Exxon lacked standing, stating that "the Court specifically left open the question of whether Exxon has standing" and that "Exxon's standing was irrelevant to the Court's determination to impose the trust."

On appeal, the State argues that the trial court's imposition of a trust was erroneous for several reasons, including that no common law precedent or statute provides for the imposition of a trust over the State's damages award. Exxon argues that trial courts have "broad and flexible equitable powers," which include the power to establish a trust over the damages awarded in this case. (Quotation omitted.)

Although we recognize that "[t]he propriety of affording equitable relief in a particular case rests in the sound discretion of the trial court," Libertarian Party of N.H. v. Sec'y of State, 158 N.H. 194, 196 (2008), this principle does not apply to the remedy in this case. The common law remedy for a tort law cause of action is lump-sum damages. See Reilly v. United States, 863 F.2d 149, 169 (1st Cir. 1988) (under the common law rule, "a court's authority to award damages for personal injuries is limited to making lump-sum judgments"); see also In re Methyl Tertiary Butyl Ether ("MTBE"), 56 F. Supp. 3d 272, 273, 275 (S.D.N.Y. 2014) (declining to impose a reversionary trust on damages awarded for Exxon's liability on claims of public nuisance, negligence, trespass, and products liability for failure to warn, because the remedy for a traditional tort law cause of action is lump-sum damages). Thus, in the absence of a statute or an agreement between the parties, when a tortfeasor loses at trial it must pay the judgment in one lump sum. See Reilly, 863 F.2d at 170; see also Vanhoy v. United States, 514 F.3d 447, 454-55 (5th Cir. 2008) (court refused to deviate from a conventional lump-sum award and create a reversionary trust over damages in the absence of any applicable statutory or precedential requirement); Frankel v. Heym, 466 F.2d 1226, 1228-29 (3d Cir. 1972) ("courts of law had no power at common law to enter judgments in terms other than a simple award of money damages"; thus, "court should not make other than lump-sum money judgments" in case brought under Federal Tort Claims Act "unless and until Congress shall authorize a different type of award").

The trial court reasoned that a trust was required because the State brought this action in its parens patriae capacity. Parens patriae, however, is simply a standing doctrine. See Hess, 161 N.H. at 431-32. As we explained in Hess, "[t]he public trust doctrine, from which the State's authority as trustee stems, and the parens patriae doctrine are both available to states seeking to remedy environmental harm." Id. at 431. "While the public trust doctrine is its own cause of action, parens patriae is a concept of standing, which allows the state to protect certain quasi-sovereign interests." Id. at 431-32 (quotations omitted). "Parens patriae does not provide a cause of action, but

may provide a state with standing to bring suit to protect a broader range of natural resources than the public trust doctrine because it does not require state ownership of such resources." Id. at 432. Accordingly, we are not persuaded that the fact that the State was allowed to proceed under parens patriae standing authorizes the imposition of a trust over the money damages awarded for Exxon's torts. In the absence of statutory or precedential support, we decline to deviate from the conventional lump-sum damages award and, accordingly, reverse the trial court's imposition of a trust as erroneous as a matter of law.

Affirmed in part; and reversed in part.

HICKS, J., and VAUGHAN, J., retired superior court justice, specially assigned under RSA 490:3, concurred.